U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 MAY -7 PM 3: 39

CLERK
BY ___pjl___
DEPUTY CLERK

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT

ESTATE OF EVA C. PUPPOLO,
CELESTE PUPPOLO, Executor,

Plaintiff

V.

JOHN J. WELCH, JR.
J. WELCH, JR., LTD.

Defendants

Case No.: 5:14-cv-95

## COMPLAINT

### PARTIES

1. Plaintiff Celeste A. Puppolo is a resident of 230 Church Street, North Adams, Massachusetts, 01247.

2. Defendant John J. Welch, Jr. is a resident of the State of Vermont, with home and workplace at 8 East Center Street, Rutland, Vermont, 05701.

3. Defendant John J. Welch, Jr., Ltd. is a Vermont professional services corporation with its principal place of business at 8 East Center Rutland, Vermont.

### JURISDICTION

4. This Court has jurisdiction because Plaintiff and Defendants reside in different states, their controversy involves disputed issues of fundamental rights, and the amount in controversy exceeds $75,000.

# CLAIMS

5. Plaintiff is the niece of Eva C. Puppolo ("Eva").

6. On February 25, 2003, Eva died.

7. On June 8, 2004, the Probate and Family Court of Berkshire, Massachusetts appointed Celeste A. Puppolo administratrix de bonis non for the Estate of Eva C. Puppolo, North Adams, Berkshire County, Massachusetts (Docket no. 03P0427-AX).

8. On August 11, 2004, the Probate Court for the District of Bennington, Vermont entered a certificate appointing Celeste A. Puppolo Executor of the Estate of Eva C. Puppolo (Docket no. P-28-04 BnT).

9. CSR Corporation ("CSR") is a corporation registered in Vermont with a principal address of 312 Crescent Boulevard, Bennington, Vermont 05201. CSR owns and operates Crescent Manor.

10. At all times material hereto, up to and including her death on February 25, 2003, Eva was a resident entrusted to the care of the Crescent Manor Care Centers ("Crescent Manor"), a nursing home facility and health care provider located in Bennington, Vermont.

11. At all times material herein, CSR was in the business of providing health care and residential nursing home care and facilities in Bennington, Vermont to, among others, Eva.

12. Health care provider Avery S. Wood, M.D. ("Dr. Wood") is a physician practicing in Bennington, Vermont. At all times materials hereto, Dr. Wood acted as Eva's primary physician and health care provider.

13. At all times material herein, health care provider John E. Hearst, M.D. ("Dr. Hearst") and health care provider Barbara E. Raskin, M.D. ("Dr. Raskin") were physicians practicing in

Bennington, Vermont, with offices in Bennington, Vermont, and who acted as on-call or house physicians for Eva.

14. At all times material hereto, Doctor(s) John Doe was/were one or more medical practitioners and health care providers who were agents and/or employees of CSR, and who were working at Crescent Manor and involved in the treatment and care of Eva at Crescent Manor.

15. At all times material hereto, Nurse(s) Jane Doe ("Nurse Jane Doe") was/were one or more registered nurses, licensed practical nurses, licensed nursing assistants, or members of CSR's staff and health care providers who were health care providers involved in the treatment and care of Eva at Crescent Manor.

16. At all times material hereto, CSR was legally responsible and liable for the actions of the other above-named health care providers under the doctrine of respondent superior.

17. Prior to her death, while of unquestionably sound mind, Eva made a Living Will.

18. At all times material hereto, Eva's Living Will was in effect and valid and its terms and conditions were well known to the above said health care providers.

19. In her Living Will, Eva directed that she be given no opiate analgesics (i.e., morphine), and, as specifically stated, "no drugs that alter mind."

20. On or about February 7, 2003, Eva was a resident at Crescent Manor and suddenly bedridden. At no time material hereto was Eva at a terminal state of life until CSR and all or some of the above said other health care providers failed to treat and care for her appropriately and reasonably.

21. On or about February 7, 2003, Eva presented with a serious wound in her lower back, in the area of her coccyx.

22. Eva experienced severe back pain caused by the wound.

23. Between February 8, 2003 and February 18, 2003, CSR and all or some of the other above said health care providers caused increasing doses of the opioid analgesic, Vicodin to be administered to Eva.

24. During the same period, CSR and all or some of the above said health care providers failed to hospitalize or otherwise adequately treat Eva's back wound.

25. During the same period, CSR and the other above said health care providers failed to administer oral and/or IV antibiotics either for prophylactic or therapeutic treatment of Eva's back wound.

26. On February 10, 2003, CSR and all or some of the above said health care providers attempted to administer the opiate morphine to Eva. She refused the drug.

27. CSR and all or some of the above said health care providers failed to take any further steps to treat Eva's said wound and ameliorate her symptoms through appropriate IV antibiotic medications, hospitalization, vacuum-assisted wound closure or other supplemental debridement therapies, alternative medications, or any other medically reasonable recourse.

28. By February 11, 2003, the wound in Eva's back measured 1.0 x 0.8 x 0.2 cm, and Dr. Wood was notified that Eva's coccygeal wound was increasing in depth.

29. The extremely serious nature and extent of the said open wound in Eva's back was then fraudulently concealed by Crescent Manor Care Centers' medical staff.

30. No one but Crescent Manor Care Centers' staff and CSR's health care providers knew of the said wound in Eva's back, its seriousness and its rapidly expanding and worsening condition.

31. Although the record indicates a "wound team" was to meet and assess Eva's condition, the

records do not show that any such meeting took place, nor did any appropriate specialist referral or emergent medical treatment of Eva's back wound ensue.

32. On February 17, 2003, CSR and all or some of the other abovesaid health care providers introduced a bedpan into Eva's routine, as she was unable to ambulate to the bathroom.

33. On February 18, 2003, the said wound had increased in size and "yellow slough" was reported.

34. On February 19, 2003, the said wound had torn and measured <u>eight</u> times the size as it did on February 11, 2003. [See Attachments 1 and 2 which reveal the extent of Eva's wound as of February 25, 2003, the date Eva died.

35. The true medical situation of Eva Puppolo at Crescent Manor Care Centers remained concealed from Henry F. Puppolo, Eva's brother and designated Power of Attorney, who knew only that his sister Eva had back pain. Henry Puppolo had requested that Crescent Manor Care Centers and Eva's above said doctors hospitalize Eva "to build her strength up."

36. Eva was never then hospitalized by any of the above said health care providers.

37. Choosing not to hospitalize Eva or to undertake any course or regimen other than painkillers, CSR and all or some of the other above said health care providers caused the powerful opiate Dilaudid to be administered to Eva on February 18, 2003.

38. The next day, February 19, 2003, CSR and all or some of the above said health care providers caused Eva to be given fentanyl, an extremely potent opioid analgesic and morphine analogue with opiate strength greatly exponential to that of morphine.

39. Thereafter, CSR and all or some of the above said health care providers administered increasing levels of the opiate fentanyl ("Duragesic") and did so in violation of the drug

manufacturer's prescribed dosing intervals for the administration of fentanyl.

40. Administration of the opiate fentanyl for relief of pain, in and of itself, was in violation of Eva's specifically expressed wishes. Moreover, administration of fentanyl in the absence of physician supervision and hospital/surgical recourse was neither medically appropriate nor a reasonable medical response to Eva's condition.

41. As Eva was administered ever increasing and inappropriately ordered doses of fentanyl and morphine sulfate, her respiration and heart action shut down.

42. Opiate class drugs of different families were then administered concomitantly to Eva in violation of directions and precautions for appropriate drug dosing.

43. On February 22, 2003, Dr. Hearst noted that IV hydration should be attempted "per Henry's request," but that recommendation was countermanded by Dr. Raskin, who chose to hold off overnight any IV hydration.

44. By February 23, 2003, the said coccygeal wound of Eva had expanded to <u>twice</u> the size as it had been four days previous and measured by the available medical records as "approximately 4 cm full thickness."

45. CSR and all or some of the other above said health care providers' response was to administer Duragesic, fentanyl by transdermal patch, at a dosage that, upon information and belief, and according to drug manufacturer's warnings, induces life-threatening hypoventilation. This dosage of fentanyl was administered contrary both to the Living Will of Eva and the express directions of those charged as agents under the Living Will, Henry F. Puppolo and Celeste A. Puppolo.

46. As of February 23, 2003, after having been administered additional Duragesic patches, Eva was lethargic, but opened her eyes and could speak a few words, though barely

comprehensibly. Her heartbeat was irregular. Possible heart failure was noted, but Crescent Manor, CSR and all or some of the other above said health care providers again failed to perform an EKG to evaluate Eva's heart.

47. On February 24, 2003, Crescent Manor, CSR and other said health care providers increased, yet once more, both the strength and frequency of Duragesic administration -- i.e., Dr. Raskin administered Duragesic at 50 mcg (micrograms) and, at the same time, additional and contraindicated morphine in the form of MSO4 (morphine sulfate) at 2 mg (milligrams) was administered.

48. This regimen again violated the drug manufacturer's instruction for Duragesic administration at <u>72-hour application intervals only</u> and at <u>doses not exceeding 25</u> mcg for patients who have had no previous long-term tolerance to fentanyl or morphine.

49. On February 25, 2003, at approximately 11:30 a.m., by the physician order of Dr. Hearst, Eva was administered <u>75 mcg fentanyl</u> via Duragesic patches, with documented intent by the same physician order to increase dosage to 100 mcg fentanyl the next day.

50. On February 25, 2003, after 11:30 a.m., Eva experienced profound respiratory distress and irregular heart beat. She suffered oxygen desaturation, respiratory failure and cardiac arrest. On this date, she died at approximately 2:00 p.m..

51. At approximately 2:30 p.m. on February 25, 2003, Eva was found in her bed by her niece, Celeste A. Puppolo, with her then 4 x 4 cm coccygeal wound -- a literal window into her anatomy, with her spinal process protuberant, cauda equina and ligamentous tissue purulent and hanging out of her body in a pool of feces and urine.

52. Eva's death was caused by lethal fentanyl poisoning, administered by and at the direction of Crescent Manor, CSR and all or some of the abovesaid health care

providers.

53. The final lethal dosage that caused the death of Eva was administered by way of a faxed physician order, without any prior physical doctor examination that morning, approximately two hours before Eva died on February 25, 2003.

54. The level of fentanyl administered to Eva approximately two hours prior to her death far exceeded the level appropriate or necessary for even a dying patient, were the drug ever to have been given for conceived compassionate reasons.

55. Upon information and belief, sudden administration of dosages of fentanyl in such high amounts was, at minimum, grossly negligent and reckless, and consequently brought about what prudent health practitioners would have known to be certain death.

56. The July 20, 2003 toxicology report by Paul Morrow, M.D. ("Dr. Morrow"), Vermont Chief Medical Examiner, revealed lethal levels of fentanyl and toxic levels of hydroxychloroquine in Eva's liver.

57. CSR and all of the other above said health care providers, their agents, servants or employees represented and held themselves out to be competent to perform or render all professional work, labor, services, treatments, tests and delivering of medications reasonably necessary for the care of Eva while she was a resident of Crescent Manor.

58. CSR and all of the other above said health care providers, their agents, servants or employees represented and held themselves out that they had the requisite skill, knowledge and ability as generally possessed by persons specializing in such type of care and treatment.

59. At all times material hereto, and while Eva was entirely free of any contributory negligence on her own part, CSR and all of the other above said health care providers did,

at least, in a grossly negligent and reckless manner, fail to treat Eva in a medically appropriate or reasonable way.  By way of illustration, but not in limitation, are the following:

    **a.**  CSR and all of the other above said health care providers failed to commence, at any time, appropriate therapeutic and palliative treatment of the wound in Eva's back;

    **b.**  CSR and all of the other above said health care providers chose a regimen of terminal painkillers instead of administering appropriate and reasonable treatment for Eva's sudden condition;

    **c.**  CSR and all of the other above said health care providers failed to administer oral and/or IV antibiotics at medically appropriate times;

    **d.**  CSR and all of the other above said health care providers administered opiate painkillers in such massive doses that they placed Eva in danger of death and eventually caused her death;

    **e.**  CSR and all of the other above said health care providers failed to hospitalize Eva at medically appropriate and necessary times;

    **f.**  CSR and all of the other above said health care providers failed to commence IV hydration at medically appropriate times and in accordance with Eva's wishes as stated in her Living Will;

    **g.**  CSR and all of the other above said health care providers failed to use an EKG to assist in an accurate analysis of Eva's heart condition;

    **h.**  CSR and all of the other above said health care providers failed properly to administer drugs and medicines, including, but not limited to Duragesic

fentanyl transdermal system (as CSR staff did so in    combination with MSO4), and hydroxychloroquine, and;

i. CSR and all of the other above said health care providers failed to make    sufficient and proper medical recordation regarding the care and  treatment provided to Eva throughout her residency at Crescent Manor, caused to be missing from Eva Puppolo's medical chart <u>five months</u> of pertinent medical records directly preceding the last month of her life, and falsified a remaining, serially reported Nurse's Care Plan.

60. In failing to render the above said would-be medical services to Eva, CSR and all of the other above said health care providers acted in, at minimum, a grossly negligent and recklessly injurious manner.

61. For all times relevant as of shortly after the demise of Eva, Plaintiff retained Christopher S. Dodig, Esq. ("Mr. Dodig"), individually and as agent and/or employee and/or partner of Donovan and O'Connor, LLP, to provide legal representation to Plaintiff for the purpose of assisting her in initiating and prosecuting a survival claim and a wrongful death claim as against other parties, to wit: CSR Corporation d/b/a Crescent Manor Care Centers, John E. Hearst, M.D., Avery S. Wood, M.D., Barbara E. Raskin, M.D., Doctors John Doe and Nurses Jane Doe.

62. As of February 25, 2005, Mr. Dodig negligently failed to advise Plaintiff of the need to initiate the commencement of a viable wrongful death claim for the benefit of the next of kin of Eva as against any one or more of the above-referenced parties by or at any time prior to February 25, 2005, the date upon which the relevant Statute of Limitations, providing for doing so, expired.

63. Plaintiff, as a direct and proximate result of said negligence and her reasonable reliance

upon the above-referenced legal assistance then being provided to her by Mr. Dodig, was deprived of the opportunity to pursue said wrongful death claim. Plaintiff and the above-captioned Estate, including the next of kin of Eva, were deprived of an opportunity to obtain Judgment and concomitant damages in respect of the same as against any of the health care providers identified above, to wit damages including: funeral expenses, pecuniary damages, "grief" damages stemming from the loss of love and companionship of Eva C. Puppolo on the part of her next of kin together with punitive damages, interest and costs as well.

64. Plaintiff retained Defendant John J. Welch, Jr., Esq. ("Mr. Welch"), individually and as agent and/or employee of John J. Welch, Jr., Ltd., to provide legal representation to Plaintiff for the purpose of assisting her in initiating and prosecuting a claim against Mr. Dodig and his law firm.

65. Mr. Welch represented to Plaintiff that he was experienced in pursuing legal and medical malpractice claims in the State of Vermont.

66. Plaintiff introduced Mr. Welch to her medical expert witness, Philip Totonelly, M.D., a New York physician, board certified in internal medicine and cardiology, and with a strong background in toxicology.

67. Based upon his review of the records, Dr. Totonelly was of the strong opinion that the CSR health care providers had breached the standard of care in rendering treatment to Eva's back, and (ii) that the health care providers had negligently or intentionally overdosed Eva with fentanyl in extreme quantities, which caused her death.

68. Mr. Welch promised Plaintiff that he would call Dr. Totonelly as an expert witness, at first in the case in chief, and later in rebuttal. He had named Dr. Totonelly in Plaintiff's 26(b)(4)

statement and procured necessary information from the doctor based on two corroborating forensic toxicology reports, both evidencing lethal fentanyl liver levels, which prompted Dr. Totonelly to opine that fentanyl was the proximate and sole cause of Eva Puppolo's death.

69. Mr. Welch accepted $31,000.00 from Plaintiff, which was to be held in escrow for use in paying Dr. Totonelly and other experts. Mr. Welch misappropriated $7,223.10 of Plaintiff's escrow trust money by paying this sum, without Plaintiff's authorization, to the defendant, Mr. Dodig, a half hour before the jury deliberated in the legal malpractice action against Mr. Dodig.

70. Mr. Welch was introduced to Brianne DiMaggio, a Licensed Nursing Assistant employee of Crescent Manor, who told Plaintiff of the manner in which Eva died, which was consistent with Dr. Totonelly's opinion.

71. Ms. DiMaggio also took her information to the Bennington, VT Police and filed a police report in connection with the medical treatment by the CSR health care providers as it pertained to Eva.

72. Mr. Welch promised and agreed to call Ms. DiMaggio as a witness at trial, but he failed to subpoena her. He also promised to use the Bennington Police report at trial but failed to do so.

73. The autopsy report of Eva Puppolo was performed by Dr. Morrow, Vermont medical examiner, on March 5, 2003.

74. Dr. Morrow requested that hair sample tests of Eva be performed at National Medical Services Laboratories in order to establish and confirm indication in the medical record that Eva had no previous tolerance to opioid drugs, and to prove therefore that the levels of fentanyl found in her liver were lethal.

75. Mr. Welch promised to utilize the hair sample toxicology.

76. Dr. Morrow's autopsy report ultimately concluded that Eva died of natural causes. Dr. Morrow stated in his report that the wound size on Eva's back measured 1 cm, when in fact it was <u>eight</u> times that.

77. Mr. Welch was introduced also to Plaintiff's medical expert witness, Benjamin Glick, M.D. ("Dr. Glick"), Massachusetts Medical Examiner, who autopsied Eva for specific assaying after Eva's body was sent back to her home state.

78. After Dr. Glick had performed his autopsy on Eva, he was of the opinion that the proximate and sole cause of Eva's death was by fentanyl intoxication, confirmed by lethal levels of fentanyl in her liver.

79. Mr. Welch was introduced to Joan McCann & Associates, Inc., a forensic document examination firm which reviewed the medical records of CSR health care providers and determined that the records had been tampered with/altered in a material way.

80. Ms. DiMaggio had also communicated to Mr. Welch that CSR had hired a company individual for the express purpose of altering Eva's medical records. Ms. DiMaggio had previously communicated the same information to Mr. Dodig.

81. Mr. Welch promised to use the evidence of altered documents at trial and advised Plaintiff to acquire the necessary report from the McCann & Associates forensic document examining firm.

82. With the advent of conflicting CSR case information, Plaintiff had legally recorded conversational exchanges with Dr. Morrow, Medicaid Fraud Unit / Department of Aging & Disabilities representatives, and Mr. Dodig.

83. Mr. Welch produced these legally recorded audiocassettes and CDs during discovery.

84. Mr. Welch promised to use the recordings at trial to impeach the Defendants' witnesses.

85. Mr. Welch was provided a copy of Eva Puppolo's Last Will And Testament, in which Eva bequeathed a portion of her estate to Crescent Manor and to one of CSR's health care providers who violated her advanced directives.

86. Mr. Welch promised to introduce Eva's will as evidence at trial.

87. Mr. Welch effectively eliminated all of Plaintiff's evidence that would have shown bad motive, ill will and malice in the case.

88. Mr. Welch failed sufficiently to prepare for trial in his neglecting to depose Defendants and the Defendants' experts, in his never having served interrogatories upon Defendants, and in his defaulting on having subpoenaed any/all key fact witnesses for trial.

89. The trial against Mr. Dodig and his firm was held from January 14, 2010 through January 25, 2010 in the Bennington County Superior Court.

90. Although the jury found that Mr. Dodig and his firm had failed timely to file the wrongful death claim and the survivor claim, they held against Plaintiff in the underlying medical malpractice action.

## COUNT I
### (Legal Malpractice)

91. Plaintiff reiterates each of the foregoing paragraphs as if set forth fully herein.

92. At all times material herein, Mr. Welch was a licensed attorney, who held himself out to the public as an experienced practitioner. Standards of care prevail under which he and attorneys are required to practice.

93. Mr. Welch violated these acceptable standards of care by, among other things:

    a.    Failing to depose Mr. Dodig;

    b.    Failing to serve discovery on Mr. Dodig;

  c. Failing to depose the expert witnesses;

  d. Failing to call Dr. Totonelly as a witness;

  e. Failing to call Ms. DiMaggio as a witness;

  f. Failing to use the critical police report as evidence at trial;

  g. Failing to use the audio tapes to impeach the defense's witnesses;

  h. Failing to introduce evidence that CSR health care providers had altered and falsified the medical records;

  i. Failing to use hair sample forensics as recommended by the Vermont medical examiner to show that Eva had no previous tolerance to the excessively high Duragesic drug doses;

  j. Representing to the Court that one of the Plaintiff's causation experts, Dr. Glick, had purportedly agreed to the contents of an unsigned affidavit and signed the affidavit which in effect changed the expert's opinion regarding the cause of Eva's death;

  k. Allowing the affidavit into evidence;

  l. Allowing Mr. Dodig then to testify on the medical aspects of the case without objecting and asking the Court for a continuance;

  m. Allowing into evidence letters from the State's Department of Aging authorities concerning Crescent Manor's purported non-negligence;

94. As a result of the aforementioned breaches of the duty of care, Plaintiff has suffered damages.

95. As a result of the breaches of the standard of care in the legal action and non-action of Mr. Welch, the jury found against Plaintiff in the underlying medical case.

**WHEREFORE**, Plaintiff for said Estate and said next of kin prays for Judgment as against Defendants jointly and severally and for damages as aforesaid thereupon in the amount of $1,000,000, together with punitive damages in the amount of $5,000,000, plus costs, interest and such other relief as may be met.

## COUNT II
### (Negligent Misrepresentation)

96. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

97. Mr. Welch had a duty of care to Plaintiff. This duty required that Mr. Welch communicate accurate information regarding his representation.

98. Mr. Welch represented to Plaintiff that he was experienced in pursuing legal malpractice and medical malpractice claims.

99. Mr. Welch promised Plaintiff that he would call Dr. Totonelly as an expert witness, first in the case in chief, and then in rebuttal.

100. Mr. Welch promised and agreed to call Ms. DiMaggio as a witness at trial.

101. Mr. Welch promised to use the critical police report as evidence at trial.

102. Mr. Welch promised to promote and utilize the forensic hair sample evidence of Eva.

103. Mr. Welch promised to use the evidence of altered, falsified documents at trial.

104. Mr. Welch promised to use the audio tapes during trial to impeach Defendants' witnesses.

105. Mr. Welch was provided a copy of Eva's Last Will And Testament, in which Eva bequeathed a portion of her estate to Crescent Manor and to one of the CSR health care providers who violated her advanced directives.

106. Mr. Welch promised to introduce Eva's will as evidence at trial.

107. The representations made by Mr. Welch were false.

108. Mr. Welch was negligent in making these false statements.

109. The statements were made by Mr. Welch with the intention that Plaintiff would rely upon them.

110. Mr. Welch knew that Plaintiff would rely upon his representations, and Plaintiff did rely upon them.

111. Plaintiff agreed and ultimately continued to agree to have Mr. Welch represent her against Mr. Dodig and his firm.

112. As a result of the negligent misrepresentations, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff for said Estate and said next of kin prays for Judgment as against Defendants jointly and severally and for damages as aforesaid thereupon in the amount of $1,000,000, together with punitive damages in the amount of $2,500,000, plus costs, interest and such other relief as may be met.

## COUNT III
### (Breach of Contract)

113. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

114. Mr. Welch made many promises regarding his representation of Plaintiff.

115. Mr. Welch promised Plaintiff that he would call Dr. Totonelly as an expert witness, first in the case in chief, and then in rebuttal.

116. Mr. Welch promised and agreed to call Ms. DiMaggio as a witness at trial.

117. Mr. Welch promised to use the critical police report as evidence at trial.

118. Mr. Welch promised to pursue Eva's hair sample toxicology for evidence at trial.

119. Mr. Welch promised to use the evidence of altered, falsified documents at trial.

120. Mr. Welch promised to use the audio tapes during trial to impeach Defendants' witnesses.

121. Mr. Welch was provided a copy of Eva's Last Will And Testament, in which Eva

bequeathed a portion of her estate to Crescent Manor and to one of the health care providers who violated her advanced directives.

122. Mr. Welch promised to introduce Eva's will as evidence.

123. Mr. Welch materially breached his agreement with Plaintiff because he failed to perform as promised.

124. As a result of the Mr. Welch's material breaches, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff for said Estate and said next of kin prays for Judgment as against Defendants jointly and severally and for damages as aforesaid thereupon in the amount of $1,000,000, plus costs, interest and such other relief as may be met.

## COUNT IV
### (Breach of Contract)

125. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

126. Plaintiff gave to Mr. Welch $31,000.00 to be used for compensating Plaintiff's expert witnesses.

127. Upon information and belief, Mr. Welch did not use the money exclusively for the payment of Plaintiff's experts and failed to provide an accounting of the money.

128. Mr. Welch materially breached his agreement with Plaintiff because he did not use the money reserved for Dr. Totonelly and instead paid a portion of the monies, without Plaintiff's authorization, to Mr. Dodig prior to the end of the trial.

129. Mr. Welch materially breached the agreement when he paid $7,223.10 to Mr. Dodig.

130. As a result of the Mr. Welch's material breaches, Plaintiff has suffered damages.

**WHEREFORE**, the foregoing premises considered, Plaintiff Celeste A. Puppolo for said Estate of Eva C. Puppolo and said next of kin prays for Judgment as against Defendants jointly and severally and for damages as aforesaid thereupon in the amount of $31,000, together, plus costs, interest and such other relief as may be met.

*Respectfully submitted,*

THE CARPENTER LAW FIRM, PLLC
By: David G. Carpenter, Esq., VT Bar No. 5017
6 Mill Street
Middlebury, VT 05753
(802) 282-2174
dgcarpenter@carpenterlawpllc.com

&

THE RICHARDSON LAW FIRM

By: Michael E. Richardson, TNBPR # 07191
707 Georgia Avenue, Suite 401
Chattanooga, Tennessee 37402
(423) 602-9623