U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 SEP 12 PM 2: 00

CLERK

BY_____
DEPUTY CLERK

|  |  |  |
|---|---|---|
| ESTATE OF EVA C. PUPPOLO, | ) | |
| CELESTE PUPPOLO, Executor, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Case No. 5:14-cv-95 |
|  | ) | |
| JOHN J. WELCH, JR., | ) | |
| J. WELCH, JR., LTD., | ) | |
|  | ) | |
| Defendants. | ) | |

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO ADMIT AUDIO RECORDINGS, DENYING DEFENDANT'S MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR EXPENSES, GRANTING DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF THOMAS O'TOOLE, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFF'S LEGAL MALPRACTICE CLAIM
(Docs. 42 & 76)

The Estate of Eva C. Puppolo, Celeste Puppolo, Executor ("Plaintiff") brings this action against Defendants John J. Welch, Jr. and J. Welch, Jr., Ltd. (collectively, "Defendant"), alleging four state-law causes of action: legal malpractice (Count I), negligent misrepresentation (Count II), and two counts of breach of contract (Counts III and IV). Pending before the court is Defendant's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, or in the Alternative, Motion to Preclude Further Opinions, and Motion for Expenses." (Doc. 42.) Defendant seeks dismissal of the action pursuant to Fed. R. Civ. P. 37 and the exclusion of the opinions of Plaintiff's legal malpractice expert, Thomas O'Toole, Esq. pursuant to Fed. R. Evid. 702. Defendant further contends that judgment as a matter of law is warranted because Plaintiff will be unable to establish the essential elements of her legal malpractice claim. Plaintiff opposes Defendant's motions.

On April 4, 2017, Attorney O'Toole testified at an evidentiary hearing held pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny (the "*Daubert* hearing"), whereupon the court took the pending motions under advisement. Thereafter, Plaintiff moved to admit certain audio recordings of telephone communications, which she contends are relevant to the issue raised by Defendant's motions (Doc. 76) (the "motion to admit audio recordings"). Defendant opposes admission, arguing that the recordings are irrelevant, are not authenticated, and may have been produced in violation of applicable law. The court took the motion to admit audio recordings under advisement on May 15, 2017.

Plaintiff is represented by R. Peter Decato, Esq. Defendant is represented by David L. Cleary, Esq.

## I.    The Undisputed Facts.

In this case, isolating the undisputed facts is no easy task. Defendant's Statement of Undisputed Facts is confined to Attorney O'Toole's opinions and does not address the factual allegations underlying Plaintiff's legal malpractice claim. Plaintiff's Statement of Disputed Facts, in turn, fails to respond directly to Defendant's Statement of Undisputed Facts. Both statements contain impermissible legal argument. As a result, the court has confined its recitation of the facts to only those which are supported by admissible evidence as required by Fed. R. Civ. P. 56(c).

Plaintiff is the niece of Eva Puppolo, who passed away in 2003 while residing at Crescent Manor Care Centers ("Crescent Manor"), a nursing facility and healthcare provider located in Bennington, Vermont. Plaintiff alleges that the administration of a lethal amount of fentanyl caused her aunt's death and maintains that this and other treatment were, "at a minimum, grossly negligent and reckless, and consequently brought about what prudent health practitioners would have known to be certain death." (Doc. 1

2

at 8, ¶ 55.)[1]  At the time of her death, Eva Puppolo was eighty-two years old (Doc. 56-1) and weighed sixty-eight pounds (Doc. 75 at 58:14-15).  Plaintiff retained Christopher S. Dodig, Esq. to prosecute survival and wrongful death claims against Crescent Manor. Attorney Dodig allegedly failed to commence a timely action and his noncompliance with the applicable statute of limitations is the fulcrum of Plaintiff's claims against him.

Plaintiff thereafter retained Defendant to bring a legal malpractice action against Attorney Dodig and his law firm in the Vermont Superior Court (the "Dodig malpractice action").  The Dodig malpractice action resulted in a defense verdict in January 2010. The Vermont Supreme Court upheld the verdict the following year. *See Puppolo v. Donovan & O'Connor, LLC*, 2011 VT 119, 191 Vt. 535, 35 A.3d 166.  On May 7, 2014, Plaintiff filed the instant action, alleging that Defendant's legal representation breached the applicable standard of care and that he breached several promises to her regarding how the Dodig malpractice action would be prosecuted.

At the court's *Daubert* hearing, nineteen exhibits were introduced into evidence, including Attorney O'Toole's expert witness opinions, his deposition transcript, and Defendant's deposition transcript.  Attorney O'Toole's opinions are reflected in three documents: an undated opinion served on June 10, 2015 (the "Undated Opinion"), a second opinion dated and served September 10, 2015 (the "September 10, 2015 Opinion"), and a third opinion dated and served August 15, 2016 (the "August 15, 2016 Opinion").

Attorney O'Toole is currently a named partner in the firm Baroody & O'Toole located in Baltimore, Maryland, and is admitted to practice law in New York, Maryland, and the District of Columbia.  Prior to his engagement in this case, Attorney O'Toole has not served as an expert witness.  He has practiced law since 1986 and began handling litigation matters in approximately 1995 or 1996, concentrating mainly on personal injury cases and other civil disputes.  In approximately the last ten years, Attorney O'Toole has

---

[1] Plaintiff alleges that Eva Puppolo executed a Living Will providing that she not be administered opiate analgesics or other "drugs that alter mind." (Doc. 1 at 3, ¶ 19.)  Plaintiff contends that her aunt's medication regimen violated those express wishes.

litigated several medical malpractice cases, trying three cases unsuccessfully to verdict. He has handled between five and ten legal malpractice cases over the past five years, although none to verdict. Attorney O'Toole acknowledged that in 2003 the Bar of Maryland suspended him for thirty days for failing to file state and federal income tax returns over a three-year period.

Attorney O'Toole has known Plaintiff for approximately the past five years. Over four years ago, they discussed the possibility of his representation of Plaintiff in this action. In early 2014, Plaintiff engaged Attorney O'Toole to represent her in multiple medical malpractice actions brought in Maryland and Washington, D.C. arising out of the deaths of her parents. In May of 2014, Plaintiff discharged Attorney O'Toole in three of those actions, accusing him of "running the legal clock in these cases without representing the Plaintiff's best interests[,]" withholding critical procedural information from her, and failing to communicate with her regularly. (Doc. 74 at 2, Ex. M.) Attorney O'Toole still represents Plaintiff in two of those actions. In his testimony, Attorney O'Toole conceded that this arrangement creates the appearance of a conflict of interest that might impact his credibility, presumably because he has an incentive to offer favorable opinions in exchange for Plaintiff foregoing a legal malpractice action against him.

In January 2015, Plaintiff disclosed Attorney O'Toole as her legal malpractice expert in this case. Attorney O'Toole and Plaintiff have not entered into a written agreement governing his expert witness services. He is not being compensated on a contingency basis, but rather plans to charge Plaintiff a fee of $300 per hour. Prior to his deposition in this action, Attorney O'Toole maintained no records regarding the hours he spent on this case. Since his deposition, he has recorded his time but has not billed for it. Although Plaintiff gave him several checks for small amounts in partial payment for his services, Attorney O'Toole destroyed them because he believed Plaintiff could not afford to pay him.

Defendant has not directly challenged Attorney O'Toole's qualifications as an expert witness or asked the court to strike his opinions on that basis. For the purposes of the pending motions, the court assumes without deciding that Attorney O'Toole is qualified to serve as an expert witness on legal and medical malpractice under Vermont law. *See In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1024 (S.D.N.Y. 1997) (observing that an expert witness must "at least have a reliable basis in the knowledge and experience of the particular discipline involved") (internal quotation marks omitted).

## A.    The Undated Opinion.

On June 10, 2015, Plaintiff served Attorney O'Toole's Undated Opinion which states as follows:

> I have been asked to review certain documents relating to the legal representation rendered by John J. Welch, Jr. ("Mr. Welch") to the Estate of Eva C. Puppolo in its action against Christopher S. Dodig and Donovan & O'Connor, LLC. I have reviewed certain trial transcripts, pleadings, motions, discovery materials, and medical records. Based upon my review and based upon my education, training, experience, and knowledge of the facts of this case, it is my opinion to a reasonable degree of legal probability, that Mr. Welch breached the standard of care in his representation of the Estate in the following ways: failed to call as an expert witness Philip Totonelli, M.D., especially as it pertains to the standard of care relating to the dosing of fentanyl in treating Ms. Puppolo; failed to call witnesses with material information, such as Brianne Dimaggio; failed to present evidence demonstrating that the increase in the size of the wound was due to a tear; failed to challenge the medical testimony of defendants' expert with available scientific information, e.g., *Disposition of Toxic Drugs and Chemicals in Man*, which was known by and discussed with Mr. Welch; failed to present evidence of the alteration by the medical providers of certain medical records; and elicited testimony from defendant Christopher Dodig regarding defendant Christopher Dodig's opinions about the merits of the underlying medical mal practice case. It is also my opinion to a reasonable degree of legal probability that but for such breaches in the standard of care, the outcome achieved by the Estate would have been different. I reserve the right to amend and/or supplement this report should additional information become available, including, e.g., reviewing the discovery deposition of defendant Welch after it is taken.

(*Id.*, Ex. 13) (spelling in original). A footnote recites Attorney O'Toole's educational background and employment history as follows:

> I graduated from law school in 1986 from the Columbus School of Law in Washington, DC. I worked for Mudge Rose Guthrie Alexander & Ferdon in New York for approximately three years[.] . . . Since that time, I have been in private practice, principally with Neal C. Baroody. A portion of my practice involves medical mal practice claims and legal mal practice claims. I have no prior testimony in the last four years. I am to be compensated at $300.00 per hour plus expenses.

*Id.* at 1 n.1 (spelling in original). After the Undated Opinion was served, the parties amended the discovery schedule to provide Plaintiff the opportunity to serve another expert opinion on or before September 10, 2015.

### B. The September 10, 2015 Opinion.

The September 10, 2015 Opinion includes the information set forth in the Undated Opinion, except that Attorney O'Toole opines that "to a reasonable degree of legal probability . . . but for such breaches in the standard of care, the Estate would have prevailed at trial on its claims." (*Id.*, Ex. 12 at 2.) The September 10, 2015 Opinion adds four footnotes which address Defendant's alleged breaches of the standard of care.

First, Attorney O'Toole opines that Defendant should not have called Benjamin Glick, M.D. to testify as to Eva Puppolo's cause of death, and should instead have called Plaintiff's preferred expert witness, Philip Totonelly, M.D., who is acting as an expert witness in at least one other case brought by Plaintiff.[2] Attorney O'Toole opines this was a breach of the standard of care for the following reasons:

---

[2] The testimony Plaintiff expected Dr. Totonelly to provide at trial is reflected in an August 12, 2005 email in which Dr. Totonelly opined that "the actual cause of death at the time of arrest is without question the administration of the lethal fentanyl dosage administered by nursing staff of" Crescent Manor. (Doc. 74, Ex. 4 at 5.) Defendant points out that Plaintiff has produced another version of this email bearing an identical date and time but which contains typographical discrepancies that allegedly call into question the document's authenticity. Plaintiff filed an affidavit signed by Dr. Totonelly on January 3, 2017 wherein Dr. Totonelly explains how he sent two different emails seconds apart.

Mr. Welsh represented to the Court during a pretrial hearing that he could not get in touch with Dr. Totonelli. As a result, he used Dr. Glick. However, Dr. Totonelli has informed the undersigned that Mr. Welsh never attempted to contact him in connection with this matter. Dr. Totonelli is a clinician, with years of experience treating patients, including those suffering from pain. Dr. Glick, on the other hand, is a medical examiner with no experience treating patients. Choosing a medical examiner with no personal experience treating patients is not reasonable under the circumstances, especially when an experience clinician was available. Dr. Totonelli is also a cardiology specialist who would have explained how the manner in which Ms. Puppolo passed was consistent with a fentanyl overdose. The decision to use Dr. Glick instead was not in good faith.

*Id.* at 1 n.1 (spelling in original).

Second, Attorney O'Toole opines that Defendant should have cross-examined Attorney Dodig's medical witnesses with the textbook *Disposition of Toxic Drugs and Chemicals in Man*. *See id.* at 1-2 n.2 (stating "Plaintiff has evidence where Mr. Welch promised to use the text in the case. In furtherance of the promise, [Plaintiff] acquired at great expense a copy of the book for trial.").

Third, Attorney O'Toole opines that Defendant failed to present evidence that Crescent Manor employees had altered Eva Puppolo's medical records. *See id.* at 2 n.3 (stating Defendant "encouraged [Plaintiff] to pursue evidence of alteration and agreed to use such evidence if discovered. [Plaintiff] retained a company to examine the records. It was determined that certain records had been altered. He breached that promise when he failed to present such evidence during trial.").

Fourth, Attorney O'Toole criticizes Defendant's decision to elicit Attorney Dodig's opinions regarding the merits of Plaintiff's medical malpractice claim against Crescent Manor:

Mr. Dodig's reasons for not pursuing the claims were not relevant to the case–only his failure to properly advise the client as to the appropriate statute of limitations. Allowing Mr. Dodig to testify to the reasons, primarily medical, as to why he did not pursue the claims was extremely prejudicial and only served to bolster the defendants' case. Allowing such testimony was not reasonable and a breach of the standard of care.

7

*Id.* at 2 n.4.

## C. Attorney O'Toole's December 9, 2015 Deposition.

Defendant noticed Attorney O'Toole's deposition, which was scheduled to take place on December 9, 2015 in Baltimore, Maryland. The Notice of Deposition (the "Notice") directed Attorney O'Toole to bring to the deposition "[h]is complete file" and any correspondence in connection with this action relating to his compensation, the "identification of facts or data that the plaintiff's attorney provided and that the expert considered in forming the opinions to be expressed[,]" and the "identification of assumptions that the plaintiff's attorney provided and that the expert relied on in forming the opinions to be expressed." (Ex. C at 1.) The Notice further instructed Attorney O'Toole to bring "[a]ll invoices, bills, or other statements for services in connection with his work" in this action. *Id.* at 2.

The day before Attorney O'Toole's scheduled deposition, Defendant's counsel informed the court that Plaintiff sought to reschedule Attorney O'Toole's deposition so that he could review Defendant's file, which purportedly had not yet been produced in full. At a telephone conference held on December 8, 2015, the court ordered the deposition to proceed and made the following inquiry:

> THE COURT: So how is he going about and writing reports and rendering legal opinions without seeing [Defendant's file]? So he filed these reports. It's time for the deposition. It is going to go forward. If you want to take a second deposition and he changes his opinion based on the review of the files, you may ask to do so, but this is no surprise to him that he is going to be deposed, and if this possession of this file was a condition precedent to him issuing an opinion, why did he issue opinions?
>
> MR. DECATO: I understand, your Honor.

(Doc. 39 at 8:11-21.)

Attorney O'Toole's deposition took place as scheduled. At his deposition, Attorney O'Toole identified six acts or omissions by Defendant that allegedly breached the applicable standard of care in his handling of the Dodig malpractice action: (1) failing to call Dr. Totonelly as an expert witness; (2) failing to call Brianne Dimaggio as a fact

8

witness; (3) failing to present evidence that Eva Puppolo's ulcer had been caused by a tear; (4) failing to introduce evidence from the textbook and other articles Plaintiff had obtained; (5) failing to present evidence that Crescent Manor employees had altered Eva Puppolo's medical records; and (6) eliciting damaging testimony from Attorney Dodig regarding the merits of the underlying medical malpractice case. Attorney O'Toole acknowledged that he did not fully read the Notice and, as a result, he did not bring to the deposition the documents required to be produced.

### D.    Attorney O'Toole's August 15, 2016 Opinion.

On February 29, 2016, at the parties' joint request, the court ordered Plaintiff to file any amended expert report "within forty-five (45) days of the receipt of the transcript of the completed deposition of Defendant, which is to occur by May 15, 2016[.]" (Doc. 41.) On July 14, 2016, Defendant moved for summary judgment, noting that Plaintiff had failed to serve an amended expert report within the time period ordered by the court and arguing that Attorney O'Toole's two prior opinions failed to comply with Fed. R. Civ. P. 26. Defendant sought dismissal of the action and the preclusion of further opinions by Attorney O'Toole.

One month later, Plaintiff opposed the motion to dismiss and served the August 15, 2016 Opinion. In that four-page opinion, Attorney O'Toole opines as follows:

Having read Mr. Welch's deposition transcript and having read the transcript of telephonic conversations pertaining to this matter, I provide the following supplementation of my previous reports on the captioned matter.

In a legal malpractice action, a plaintiff must prove that the attorney was in fact negligent and that this negligence was the proximate cause of the plaintiff's injury. (See, Fleming v. Nicholson, 168 Vt. 495, 497, 724 A.2d 1026, 1028 (1998)). In a legal malpractice action, the required standard of conduct is the exercise of professional care and skill. Hamilton v. Sommers, 2014 S.D. 76, ¶ 1, 855 N.W.2d 855, 858. Vermont appears to recognize the doctrine of judgmental immunity. Roberts v. Chimileski, 2003 VT 10, 175 Vt. 480, 820 A.2d 995. Under the doctrine of judgmental immunity, an attorney is not liable for acts and omissions in the conduct of litigation which are based on an honest exercise of professional judgment.

9

It is my opinion, held to a reasonable degree of legal probability, that Mr. Welch departed from the standard of skill and care held out for the legal profession in the State of Vermont. In my opinion Mr. Welch has not exercised the professional care and skill expected of a Vermont attorney litigating a case where the main goal is to obtain punitive damages. It is further my opinion that Mr. Welch isn't or shouldn't be protected by the judgmental immunity doctrine as the evidence supports that Mr. Welch didn't act in good faith and upon an informed judgment after undertaking reasonable research of the relevant legal princip[le]s and facts of the given case. See, e.g., Smith v. Lewis, 13 Cal. 3d 349, 530 P.2d 589, 595, 118 Cal. Rptr. 621 (Cal. 1975).

Even though Mr. Welch intended to seek punitive damages, he testified that he wasn't familiar with Pion v. Bean, 2003 VT 79, 176 Vt. 1, 833 A.2d 1248. However, he conceded that Pion accurately described the law in the State of Vermont as it existed in 2010. Pion says that punitive damages are appropriate where there has been a showing of actual malice or a showing of conduct manifesting personal ill will or conduct carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights will suffice.

In his deposition, Mr. Welch indicated that the basis of the wrongful death action would have been related to administering too much fentanyl and that he intended to get punitive damages by showing reckless and wanton behavior. If getting punitive damages was Mr. Welch's goal, he failed to pursue and utilize the available evidence to establish malice or reckless and wanton behavior.

I mentioned the evidence Mr. Welch ignored in my earlier opinion(s): Mr. Welch failed to call as an expert Philip Totonelly, M.D., especially as it pertains to the standard of care relating to the dosing of fentanyl in treating Ms. Puppolo; failed to call witnesses with material information, such as Brianne DiMaggio; failed to present evidence demonstrating that the increase in the size of the ulcer was due to a tear; failed to challenge the medical testimony of defendants' expert with available scientific information, e.g., *Disposition of Toxic Drugs and Chemicals in Man*, which was known by and discussed with Mr. Welch; failed to present evidence of the alteration by the medical providers of certain medical records; and elicited testimony from defendant Christopher Dodig regarding the merits of the underlying medical malpractice case.

I am concerned by the fact that Mr. Welch represented to the trial court that he chose not to use Dr. Totonelly because he attempted to contact him on a plurality of occasions and was unable to reach him. I called Dr. Totonelly

and had no trouble reaching him. When I did reach Dr. Totonelly, he indicated that Mr. Welch had never tried to contact him. Mr. Welch testified that he could understand why Celeste Puppolo believed he was going to call Dr. Totonelly as a witness and that he recalls promising to call Dr. Totonelly as a rebuttal witness.

In his deposition, Mr. Welch admitted to knowing of Dr. Totonelly and he knew that Dr. Totonelly had strong opinions. Mr. Welch knew that Dr. Totonelly had the opinion that the Crescent Manor health care providers had negligently or intentionally overdosed Eva Puppolo with fentanyl in extreme quantities which caused her death. This is very strong evidence establishing negligence, especially considering that there was a claim for punitive damages.

Mr. Welch admitted in his deposition that he had initially planned on using Dr. Totonelly as a witness. Dr. Totonelly was listed as an expert witness in the 26(b)(4) disclosures. I have reviewed Dr. Totonelly's written opinion, and there is nothing in Dr. Totonelly's written opinion that should give pause to any reasonable attorney trying to establish negligence and get punitive damages. During his deposition, Mr. Welch suggested that Dr. Totonelly would have been impeached by his prior opinion(s) as to [Crescent Manor's] role in causing Eva Puppolo's death. However, this was not the reason he represented to the trial court as to why he was not using Dr. Totonelly. He represented to the trial court that he tried to contact Dr. Totonelly, but was unsuccessful and left to rely on Dr. Glick.

Mr. Welch admitted in his deposition having a discussion with Celeste Puppolo about using Dr. Totonelly as a rebuttal witness. This representation to Celeste Puppolo is concerning because he represented to the trial court that he was unable to contact Dr. Totonelly. In addition, Dr. Totonelly advised me that Mr. Welch had not contacted him in connection with this case. However, even if Mr. Welch really intended to call Dr. Totonelly on rebuttal, during his deposition, he questioned the wisdom of using Dr. Totonelly in this manner. In my opinion, Dr. Totonelly's vastly superior clinical background mandated that he be utilized in the Estate's case in chief to establish negligence and get beyond a motion for a directed verdict on the issue of punitive damages. Ultimately, Judge Suntag set aside the request for punitive damages. In my opinion, if Mr. Welch had called Dr. Totonelly to testify in the Estate's case in chief, Judge Suntag would have decided otherwise.

In my opinion, Brianne DiMaggio and some of her fellow nurses should have been called to testify. Mr. Welch was aware that Brianne told the Bennington Police she thought someone at Crescent Manor had

intentionally given an overdose of fentanyl to bring about Eva Puppolo's death. Ms. DiMaggio indicated she had provided care for Eva Puppolo and she was of the following belief: (1) Crescent Manor had killed Eva Puppolo; (2) Crescent Manor tore Eva's coccyx with a bedpan and failed to take care of the tear on Eva's backside; and (3) Crescent Manor had "redone" Eva's medical records immediately after Eva's death. This evidence goes directly to punitive damages, and it was ignored. Ignoring this evidence shows, in my opinion, a lack of professional care and skill.

There was evidence that the nurses were holding a lottery of sorts in to guess when Eva would die from the fentanyl. This evidence would go directly to the issue of malice and to the issue of punitive damages. Excluding this evidence shows a lack of professional care and skill. If this evidence was presented, along with the evidence of the altered medical records and the evidence from Dr. Totonelly, Brianne DiMaggio and some of the other nurses, then the Estate's claims of negligence and for punitive damages would likely have succeeded.

The evidence I've seen suggests that Mr. Welch made promises to try the claim against Attorney Dodig a certain way and then Mr. Welch reneged on the promises. He agreed at one time to call Dr. Totonelly, Brianne DiMaggio and some of the other nurses, but didn't. He agreed at one time to use the report from Joan McCann about the altered medical records and didn't. In my opinion, the refusal to use this and the other evidence shows poor judgment and lack of good faith.

An attorney is not infallible when he makes choices about what experts to call and what exhibits to put in. However, he still has to use professional care and skill and Mr. Welch failed to do so. Mr. Welch's judgments were not the honest exercise of professional judgment.

In my opinion, Mr. Welch's failure to use available evidence and his broken promises to his client constitutes a breach of Mr. Welch's duties to use professional skill and care. It is also my opinion, based upon a reasonable degree of legal probability, that but for Mr. Welch's failures, a jury would more likely than not have returned a verdict for the Estate and have awarded general _and_ punitive damages. I believe Mr. Welch's breach of the standard of care was the proximate cause of the Estate's failure to succeed with . . . Judge Sontag and the jury.

A solemn relationship of trust and confidence exists between an attorney and his client. It was violated in this case. The failure of Mr. Welch to call Dr. Totonelly; to deal credibly with Dr. Glick; to call Brianne DiMaggio and many of the other nurses; and to use evidence of altered medical records all caused the Estate to lose its case and lose its claims of

12

negligence and for punitive damages. Mr. Welch failed to use the competent evidence, all of which tended to support the Estates' claims for compensatory and punitive damages. According to Mr. Welch, "It is well established that 'an attorney's decision to pursue one of several reasonable courses of action does not constitute malpractice.'" In light of his obligations and representations to the client and the trial court, Mr. Welch failed to act reasonably. Therefore, it is my opinion, held to a reasonable legal probability, that Mr. Welch committed legal malpractice and caused the Estate harm.

(Doc. 74, Ex. 7 at 1-4) (spelling in original).

Attorney O'Toole testified that Plaintiff's counsel provided him with a draft of the August 15, 2016 expert witness opinion to which he made certain minor edits. He then converted the document into letter format, and Plaintiff served it on Defendant. Attorney O'Toole acknowledged that he did not perform the legal research that is reflected in his August 15, 2016 Opinion. A comparison of the opinion drafted by Plaintiff's counsel and Attorney O'Toole's August 15, 2016 Opinion reveals that they are substantially identical with minor revisions.

## E.    Attorney O'Toole's Testimony Regarding the Extent of His Reliance on Plaintiff's Audio Recordings and the Transcriptions Thereof.

On April 2, 2017, Plaintiff moved *in limine* to admit uncertified transcripts of seven audio recordings she surreptitiously made of telephone conversations with Defendant in 2008-10 and with certain fact witnesses. Plaintiff contends that these materials "may have some bearing on the parties' *Daubert* hearing to be held on Tuesday, April 4, 2017[.]" (Doc. 72 at 3, ¶ 14.) Plaintiff also filed seven supporting affidavits, in which she described the circumstances, timing, and manner in which she created the audio recordings, which include material unrelated to this action. *See, e.g.*, Doc. 72-1 at 3, ¶ 8 (Plaintiff's affidavit noting that "[v]oices unrelated to this litigation, and in the order in which they occur, are Dr. Bier, Dr. Mamo, Patrick, Marcia, and John"). Plaintiff's own affidavit states that she read the uncertified transcripts of the audio recordings and opines that they had been accurately transcribed.

At the *Daubert* hearing, the court denied Plaintiff's motion to admit the uncertified transcripts of the audio recordings without prejudice, and stated as follows:

> THE COURT: . . . What [Plaintiff] has asked me to do is to rely on a transcript in lieu of the audiotapes. That's the problem, because I would typically have an unbiased third party certify that this is a true and accurate copy of the audiotape. . . . I am going to deny the motion without prejudice. If you give me the audiotapes, that's the best evidence. The Court can listen to them . . . and determine whether or not they should be admissible.

> MR. DECATO: We will do that if you give us leave to go get them and give them to the Court.

> THE COURT: Sure. You don't have to do it right now. I am just saying that I can't accept the evidence in the form that you proffered[.]

(Doc. 75 at 7:19-8:7.)

Attorney O'Toole was thereafter examined regarding the facts and data he considered in forming his expert opinions. His August 15, 2016 Opinion is the only opinion that arguably references the audio recordings, stating only that he "read the transcript of telephonic conversations pertaining to this matter[.]" (*Id.*, Ex. 7 at 1.) In his testimony both at deposition and at the court's *Daubert* hearing, Attorney O'Toole drew no connection between the audio recordings and his opinions. At his December 9, 2015 deposition, Attorney O'Toole testified: "Well, I don't know whether I read a transcript, listened to a tape. I'm not sure." (Doc. 81-1 at 151:13-14.)

At the *Daubert* hearing, Attorney O'Toole testified that he read the transcripts of Plaintiff's audio recordings, but had not listened to the recordings themselves:

> Q. I'm talking about transcriptions of telephone calls.

> A. Oh. I read some of the transcriptions, yes. . . .

> Q. All right. Did you ever listen to the tapes?

> A. No, I don't think I listened to those tapes, but I don't know.

> Q. Did you ever inquire as to whether or not the recordings were made legally?

> A. I was told that they were made legally.

14

(Doc. 75 at 187:4-15.)

At the conclusion of the *Daubert* hearing, the court expressed doubt regarding the relevance of the underlying recordings:

> THE COURT: . . . I have already said this, but I am not going to accept transcripts prepared by a party. And I want the best evidence, the audiotapes. You can renew the request to admit them. I am not so sure that they have much to do with the *Daubert* hearing because the witness was so imprecise about what he had reviewed and what he hadn't reviewed. So I have no way of telling whether they are relevant or not.

*Id.* at 211:4-14.

On April 25, 2017, Plaintiff filed the motion to admit audio recordings, contending that "[l]istening to the audiotape evidence has a bearing on the parties' *Daubert* hearing held on Tuesday, April 4, 2017[,] as F.R.E. Rule 703 states that an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Attorney O'Toole is aware of the audiotape evidence and the evidence that bears on the issue of [Defendant's] deceit." (Doc. 76 at 2, ¶ 3.) Plaintiff did not address Attorney O'Toole's equivocal testimony regarding whether he actually listened to the audio recordings or reviewed the transcripts of them. In a May 23, 2017 filing, Plaintiff represented that "Mr. O'Toole has not listened to the recordings since 2012" but that "[t]he recordings had made a permanent impression on him when he first did his research on this case, and he remembers the intensity of the dialog[ue]." (Doc. 79 at 2-3, ¶ 4.) Plaintiff attached an affidavit signed by Attorney O'Toole dated May 23, 2017, wherein he averred that "[l]istening to the tapes and reading the trial transcript provided me with the background information and facts I needed to form my opinions regarding legal malpractice." (Doc. 79-1 at 1, ¶ 3.)

## II. Conclusions of Law and Analysis.

### A. Whether to Grant Plaintiff's Motion to Admit Audio Recordings.

The audio recordings Plaintiff seeks to admit are relevant only to the extent that Attorney O'Toole relied upon them in forming his opinions. *See* Fed. R. Evid. 702(b). In both his December 9, 2015 deposition and at the *Daubert* hearing, Attorney O'Toole

testified that he either did not listen to the audio recordings or, at best, that he did not know whether he had listened to them. None of his expert opinions indicate that he relied on the audio recordings, despite his obligation to disclose "the facts or data [he] considered . . . in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii); *see also id.*, advisory committee's note to 2010 amendment (noting "the intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients"). The strongest evidence of his reliance on the recordings is his August 15, 2016 Opinion which reflects that he reviewed an unspecified "transcript of telephonic conversations pertaining to this matter." (Doc. 74, Ex. 7.)

Attorney O'Toole's post-hearing affidavit seeks to alter the record by stating that he relied on both the audio recordings and the transcripts in forming his opinions. His affidavit does not identify when he undertook those tasks. The court declines to allow him to "correct" his testimony in this *post hoc* manner.[3] As Plaintiff has failed to satisfy her obligation to show that the audio recordings are relevant, Plaintiff's motion to admit audio recordings (Doc. 76) is DENIED. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (stating that "in analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case").

## B. Whether Defendant Is Entitled to Rule 37 Sanctions.

### 1. Whether Plaintiff's Untimely Service of the August 15, 2016 Opinion Warrants Dismissal of the Action.

Defendant argues that Plaintiff's failure to timely serve the August 15, 2016 Opinion is inexcusable and justifies dismissal of the action. "If a party . . . fails to obey

---

[3] *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193-94 (2d Cir. 2013) (holding that the district court was "entitled to disregard [expert's] new testimony . . . where the relevant contradictions between the first and second depositions are unequivocal and inescapable, unexplained, arose after the motion for summary judgment was filed, and are central to the claim at issue"); *Carbotrade, S.p.A. v. Bureau Veritas*, 1999 WL 714126, at *15 (S.D.N.Y. Sept. 14, 1999) (concluding an expert's "prior inconsistent statements undercut the credibility of his recently formulated opinion at trial").

an order to provide or permit discovery, . . . the court where the action is pending may . . . dismiss[] the action or proceeding in whole or in part[.]" Fed. R. Civ. P. 37(b)(2)(A)(v). The sanction of dismissal is appropriate only in "extreme situations," such as "when a court finds willfulness, bad faith, or any fault on the part of the" non-compliant party. *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 451 (2d Cir. 2013) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990)) (internal quotation marks omitted). The court is guided by the following factors in evaluating whether this sanction is warranted: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (internal quotation marks omitted).

Here, although Plaintiff's noncompliance was willful and the period of noncompliance was inexcusable, the extreme sanction of dismissal of the case is not warranted. "Parties must be given notice and an opportunity to respond before a cause of action, or potential remedy, is dismissed as a sanction for failure to comply with court orders." *Id.* at 160. No notice was provided in this case. In addition, while the degree of prejudice to Defendant is substantial, the consequences to Plaintiff are far greater and border on draconian. Lesser sanctions will appropriately address the untimely disclosure of Attorney O'Toole's opinions, remedy the prejudice to Defendant, and still allow Plaintiff to have her claims considered on their merits. *See Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996) (stating that "[t]he remedy [of dismissal] is pungent, rarely used, and conclusive. A district judge should employ it only when he is sure of the impotence of lesser sanctions.") (internal quotation marks omitted) (alteration in original).

For the foregoing reasons, Defendant's motion to dismiss the action as a Rule 37 sanction is DENIED.

17

## 2. Whether Plaintiff's Untimely Service of the August 15, 2016 Opinion Precludes Its Admissibility.

In the alternative, Defendant argues that Attorney O'Toole's August 15, 2016 Opinion should be precluded as a sanction for its untimely disclosure without justification. This would leave the Undated Opinion and the September 10, 2015 Opinion as Plaintiff's only expert witness disclosures. In determining an appropriate response, the court is guided by Fed. R. Civ. P. 37, which provides, in pertinent part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In determining whether a party's violation is "substantially justified or harmless," courts in the Second Circuit consider: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)).

It is undisputed that Plaintiff served Attorney O'Toole's August 15, 2016 Opinion over one month after the court-ordered deadline to do so. Plaintiff neither sought leave of court to extend that deadline, nor requested an extension from Defendant. *See Beyer v. Anchor Insulation Co.*, 2016 WL 3676091, at \*4 (D. Conn. July 6, 2016) (finding no adequate explanation for the party's failure to comply with a discovery order and noting that "plaintiffs continued to conduct expert discovery after their deadline without notice to the defendants or leave from the court"). Plaintiff proffers no explanation for failing to comply with the court's discovery deadline. Because she has initiated and pursued at least three lawsuits, each alleging some form of professional malpractice, she is not a neophyte in the requirements of litigation. Throughout this proceeding she has been

18

represented by counsel. There is thus no reasonable justification for her noncompliance with the court's discovery deadlines.

Regarding the opinion's importance, prior to the late service of the August 15, 2016 Opinion, Plaintiff had disclosed two opinions by Attorney O'Toole, which were required to set forth "a complete statement of all" of his opinions. Fed. R. Civ. P. 26(a)(2)(B)(i). Attorney O'Toole's August 15, 2016 Opinion purports to materially alter those opinions. Accordingly, permitting Plaintiff to rely on Attorney O'Toole's August 15, 2016 Opinion would prejudice Defendant because it would require Defendant to confront a new opinion after a summary judgment motion has been filed. A continuance may remedy some of the prejudice to Defendant, but would not avoid a waste party and judicial resources. *See Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 301 F.R.D. 31, 41 (S.D.N.Y. 2014) (holding that "a continuance is not appropriate, given the age of this case and the fact that discovery has long been closed"); *see also Softel*, 118 F.3d at 963 (stating that "the enormous length of every step of the proceedings in this case militate[s] against any more continuances"). As one court has observed:

> Defendants are entitled to make summary judgment motions on the basis of the discovery record compiled in accordance with the federal rules and the court's orders. [A party's] new expert theory cannot be presented without giving [the opposing party] an opportunity to depose his experts, thus reopening discovery and rendering [that party's] motion, addressed in good faith to the theories and evidence that had been disclosed, an expensive waste of effort.

*Every v. Makita U.S.A., Inc.*, 2005 WL 2757952, at *6 (S.D.N.Y. Oct. 24, 2005).

Viewing the relevant factors collectively, the court concludes that Plaintiff's untimely service of Attorney O'Toole's August 15, 2016 Opinion is neither harmless, nor excusable. *See In re Omeprazole Patent Litig.*, 2002 WL 287785, at *5 (S.D.N.Y. Feb. 27, 2002) (precluding improperly disclosed expert testimony where "not one of [the] factors weighs in favor of permitting the new opinions in this case"). On this basis alone, the opinion is subject to exclusion. The court nonetheless proceeds to evaluate the merits of the August 15, 2016 Opinion to determine whether it is otherwise admissible. If it is,

the sanction of exclusion may be too harsh. If it is inadmissible, Plaintiff will suffer no prejudice as a result of its exclusion. The court thus DEFERS ruling on Defendant's motion to exclude until the admissibility of the August 15, 2016 Opinion is determined.

### 3.    Whether Defendant Is Entitled to Costs Occasioned by the Untimely Disclosure of the August 15, 2016 Opinion.

Pursuant to Rule 37, "[i]n addition to or instead of [the sanction of preclusion], the court, on motion and after giving an opportunity to be heard . . . may order payment of the reasonable expenses, including attorney's fees, caused by" a party's untimely disclosure. Fed. R. Civ. P. 37(c)(1)(A). This court "has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37, and its ruling will be reversed only if it constitutes an abuse of discretion." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). In exercising its discretion, "the court may draw upon its first hand familiarity with all the pertinent circumstances of the particular case." *Mayo-Coleman v. Am. Sugar Holding, Inc.*, 2016 WL 7378767, at *1 (S.D.N.Y. Nov. 16, 2016) (internal quotation marks omitted).

In seeking exclusion of the August 15, 2016 Opinion, Defendant requests "all costs associated with bringing this motion, and the activities leading up to the motion, including all attorneys' fees[.]" (Doc. 42 at 25.) In his July 14, 2016 affidavit, Defendant's counsel identifies four categories covered by this request: (1) the expense associated with preparing for and attending Defendant's deposition ($10,019.50); (2) the expense associated with the production of files in response to Attorney O'Toole's deposition ($1,267.00); (3) unspecified additional costs associated with the prior two categories ($1,713.75); and (4) fees and costs associated with preparing and filing the instant motions ($3,872.00).

Because Defendant's motion was precipitated, at least in part, by the late disclosure of the August 15, 2016 Opinion which the court has found both unjustified and prejudicial, an award of costs is appropriate. However, because Defendant's motion seeks relief on several other grounds that do not stem from Plaintiff's late expert witness

20

disclosure, those costs must be excluded. For example, Defendant has not shown why he should recover costs and fees for preparing for and attending his own deposition. While he asserts that Plaintiff requested to depose him so that Attorney O'Toole could amend his opinions, the parties jointly moved to amend the discovery schedule to allow Defendant's deposition without any provision that Plaintiff bear the costs thereof.

In addition to attorney's fees and expenses associated with the motion to exclude, Defendant seeks an award of costs in the amount of $1,267.00 for the production of his files to Attorney O'Toole after his December 9, 2015 deposition. Because Plaintiff was entitled to production of Defendant's file, Defendant may recover only photocopying costs.

On balance, the court attributes $500 of Defendant's expenses of $3,872.00 incurred in filing the pending motions to Plaintiff's untimely expert disclosure, and attributes the remaining amounts to unrelated issues. In the absence of a more particularized statement, the court has no other means of segregating the expenses incurred by the untimely disclosure. Even without this information, however, the court has little difficulty in concluding that at least $500 in attorney's fees are attributable to Defendant's motion to exclude. In the event Defendant contends that additional fees and expenses were incurred in responding to Plaintiff's untimely disclosure, he may renew his application supported by a particularized statement as to the tasks involved, the fees and costs incurred, and his counsel's hours expended and hourly rate.

For the reasons stated above, the court GRANTS IN PART AND DENIES IN PART Defendant's request for expenses and ORDERS Plaintiff to pay Defendant the sum of $500.00, together with Defendant's costs, if any, incurred in photocopying his file for production to Plaintiff.

21

### C. Whether to Exclude Attorney O'Toole's Opinions Pursuant to Rule 702.

The admissibility of Attorney O'Toole's opinions is governed by Fed. R. Evid. 702, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:"

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The court therefore assumes a "gatekeeping" role "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). This gatekeeping obligation "applies to all expert testimony" and not simply to "scientific" testimony. *Id.* at 147. The party proffering expert testimony bears the burden of establishing its admissibility "by a preponderance of proof." *Daubert*, 509 U.S. at 592 n.10.

In *Daubert*, the Court identified several factors to be considered in determining whether an expert's opinion is admissible: whether the expert's theory or technique "can be (and has been) tested," whether it has been subjected to peer review or publication, its known or potential rate of error, and its "'general acceptance'" within the particular discipline. *Id.* at 593-94. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

The trial court's inquiry is "a flexible one" whose "overarching subject" is the "evidentiary relevance and reliability . . . of the principles that underlie a proposed submission." *Id.* at 594-95. The court therefore has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152; *see also Amorgianos*, 303 F.3d at 266 (observing that "the *Daubert* inquiry is fluid and will necessarily vary from case to case"). "The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos*, 303 F.3d at 267. The court's "focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Defendant contends Attorney O'Toole's opinions are inadmissible because they are unreliable. Expert testimony in a legal malpractice action "does not lend itself to the scientific and technical concerns expressed by *Daubert*." *Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, 2011 WL 5976076, at *12 (E.D.N.Y. Nov. 28, 2011) (quoting *LNC Invs. Inc. v. First Fidelity Bank*, 2000 WL 1024717, at *4 (S.D.N.Y. July 25, 2000)). Nonetheless, a legal malpractice expert "must do more than aver conclusorily that his experience led to his opinion[.]" *523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 643 (S.D.N.Y. 2014). In addition to Rule 702 and *Daubert* and its progeny, the court must consider whether an opinion's tendency to assist "the trier of fact to understand the evidence or to determine a fact in issue[,]" Fed. R. Evid. 702(a), is outweighed by other considerations such as unfair prejudice and the possibility of misleading and confusing the jury. Fed. R. Evid. 403.

## 1. The Undated and September 10, 2015 Opinions.

With regard to the Undated and September 10, 2015 Opinions, Attorney O'Toole states that he "reviewed certain trial transcripts, pleadings, motions, discovery materials, and medical records" in forming his opinions. (Doc. 74, Ex. 14 at 1.) These "cursory reference[s] to the sources of his opinion[s] do not enable the [c]ourt to determine that"

his opinions are "based on sufficient facts or data." *Kellogg v. Wyeth*, 2012 WL 2970621, at *5 (D. Vt. July 20, 2012); *see also* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring that an expert report disclose "the facts or data considered by the witness in forming" his or her opinions). From the proceedings in this case, the court is aware that Attorney O'Toole did not review Defendant's complete file or have the benefit of Defendant's deposition before he rendered the Undated Opinion and the September 10, 2015 Opinion. Attorney O'Toole could therefore only speculate regarding the factual and legal underpinning of Defendant's strategic decisions. *See Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2010 WL 2232670, at *8 (D. Conn. June 2, 2010) (excluding testimony of expert who was unaware of alternative explanations for the outcome of an arbitration proceeding and holding that the expert's "failure to consider these other factors renders her opinion unreliable").

Moreover, both the Undated Opinion and the September 10, 2015 Opinion consist of a litany of strategic decisions made by Defendant without tying those decisions to the applicable law. The court thus has no means of determining whether Attorney O'Toole applied the correct standard of care under Vermont law in reaching his opinions. Because Attorney O'Toole has never practiced in Vermont and is not licensed in this jurisdiction, and because neither the Undated Opinion nor the September 10, 2015 Opinion disclose any legal research, the court cannot assume he consulted Vermont law prior to rendering his opinions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (observing that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

The Supreme Court has "clarified that, whether a witness's area of expertise was technical, scientific, or more generally 'experience-based,' Rule 702 requires the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert

24

in the relevant field." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (citations and footnote omitted). In the case of the Undated Opinion and the September 10, 2015 Opinion, that intellectual rigor is lacking. *See Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (concluding that *Daubert* "requires the district judge to satisfy [herself] that the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting").

The Undated Opinion and the September 10, 2015 Opinion suffer from the additional deficiency that they assert that Plaintiff would have prevailed in the Dodig malpractice action if some or all of Defendant's strategic decisions had not been made. These statements are conclusory in nature and do not account for countervailing facts. *See Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (holding that expert testimony is "inadmissible as unreliable where it consists of conclusory and speculative opinions" and that the expert's medical malpractice opinions "provided conclusory and speculative statements" regarding the defendant's negligence); *S.E.C. v. Badian*, 822 F. Supp. 2d 352, 357 (S.D.N.Y. 2011) (excluding expert testimony that is "replete with inadmissible generalized statements of law, legal conclusions and conclusory statements"). For example, neither opinion addresses Dr. Totonelly's provision of a prior inconsistent written opinion regarding the cause of Eva Puppolo's death,[4] or the fact that Eva Puppolo was elderly and severely underweight at the time of her death. Choosing an unequivocal cause of death opinion from a medical examiner such as Dr. Glick over the inconsistent opinions of Dr. Totonelly, a clinician who presumably neither treated nor examined Eva Puppolo, is not an error so patently obvious that analysis is unnecessary.

---

[4] Contrary to his August 12, 2005 opinion that Eva Puppolo's death was caused by a lethal dose of fentanyl, according to a June 1, 2005 disclosure, Dr. Totonelly opined as follows:

> [B]y providing Ms. Puppolo with Glyburide instead of Enalapril Ms. Puppolo was caused to go into a hypoglycemic shock. He will testify that attempts to treat this resulted in a fluid overload causing congestive heart failure and considerable shock and damage to her kidneys. This precipitated a downward course for Ms. Puppolo and hastened the progression of her underlying cardiac conditions.

(Doc. 74, Ex. G at 1.)

Similarly, neither opinion addresses the fact that lay witness Brianne Dimaggio was investigated by the police for her alleged role in Eva Puppolo's death. On that basis, the credibility of her allegations that the nurses conducted a lottery regarding the timing of Eva Puppolo's death, that Crescent Manor "killed" her, and that Crescent Manor hired an outside firm to alter its own medical records are subject to impeachment. Defendant was entitled to consider those countervailing facts in deciding whether to call her as a witness.

As for Defendant's eliciting Attorney Dodig's opinions regarding the merits of the medical malpractice action, neither the Undated Opinion nor the September 10, 2015 Opinion indicate whether this was the sole evidence on that point or whether it was merely cumulative. Taking into consideration the defense verdict in the Dodig malpractice action, evidence that the Estate's medical malpractice claim lacked merit was likely presented to the jury by the defense.

Finally, both the Undated Opinion and the September 10, 2015 Opinion assert a number of legal conclusions. "Although testimony that embraces an ultimate issue to be decided by the jury is not inadmissible *per se*, Fed. R. Evid. 704, it should not be received if it is based on 'inadequately explored legal criteria.'" *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 709 (2d Cir. 1989) (citation omitted). Here, both opinions assert opinions regarding causation without explaining the law and the facts that support those conclusions.

In light of the significant analytical gap between Attorney O'Toole's opinions and the facts and law upon which they are premised, the failure to sufficiently identify the facts and data upon which they are based, and the fact that Attorney O'Toole rendered his opinions without the benefit of Defendant's complete file or deposition, the Undated Opinion and the September 10, 2015 opinion would not assist the jury in determining whether Defendant committed legal malpractice. *See Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Amorgianos*, 303 F.3d at 270 ("In light of the defects in the

26

methodologies employed by plaintiffs' experts and the district court's reasonable determination that there was a significant 'analytical gap' between the experts' opinions and the studies on which they relied in reaching their conclusions, the district court's exclusion of plaintiffs' experts' testimony because it was not grounded in science was well within its discretion."). When coupled with the Plaintiff's noncompliance with Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702(b) in disclosing the opinions despite ample time and opportunity to do so, there are no grounds on which they should be admitted. For the foregoing reasons, the Undated Opinion and the September 10, 2015 Opinion are hereby EXCLUDED.

## 2.    The August 15, 2016 Opinion.

The August 15, 2016 Opinion consists of a narrative prefaced by a statement that "[h]aving read Mr. Welch's deposition transcript and having read the transcript of telephonic conversations pertaining to this matter, I provide the following supplementation of my previous reports on the captioned matter." (Doc. 74, Ex. 7 at 1.) This vague statement fails to cure the deficits in the Undated Opinion and the September 10, 2015 Opinion in identifying the facts and data upon which Attorney O'Toole's opinions are based. *See* Fed. R. Civ. P. 26(a)(2); Fed. R. Evid. 702(b). On that basis alone, the August 15, 2016 Opinion is subject to exclusion. *See Amorgianos*, 303 F.3d at 267 ("To warrant admissibility . . . it is critical that an expert's analysis be reliable at every step.").

Although the August 15, 2016 Opinion sets forth substantially more facts and legal analysis than the Undated Opinion and the September 10, 2015 Opinion, it is merely a conduit for the opinions of Plaintiff and her counsel. *See Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*, 2006 WL 1319543, at *8 (S.D.N.Y. May 11, 2006) (precluding expert testimony that "would in large measure simply parrot the testimony that [plaintiff] may be expected to give at the trial"); *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is

27

generally excluded."). Attorney O'Toole acknowledged at the court's *Daubert* hearing that he performed none of the legal research presented in the August 15, 2016 Opinion and merely made minor revisions to the expert witness opinion prepared for him by Plaintiff's counsel. Because the August 15, 2016 Opinion is not "the product of [Attorney O'Toole's] independent analysis[,]" it is inadmissible. *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009); *see also Toole v. Toshin Co.*, 2004 WL 2202580, at *3 (W.D.N.Y. Sept. 29, 2004) ("In assessing the reliability of an expert's methodology, the court should also consider whether the expert's opinion emanates from his own independent research[.]").

Attorney O'Toole's August 15, 2016 Opinion is inadmissible for the further reason that it is based on an erroneous assumption that dishonesty to a court or to a client, a lack of good faith, or a breach of promise to call a witness or present evidence, are sufficient to sustain a claim of legal malpractice under Vermont law. The Vermont Supreme Court has expressly held that the failure to call Dr. Totonelly was a "strategy disagreement" for which Plaintiff's wishes must give way to her attorney's exercise of professional judgment:

> She also complained of her attorney's choice of expert witness. While plaintiff conceded that both her preferred expert and the expert her attorney eventually hired came to the same conclusion–that her aunt had died of a Fentanyl overdose–she felt her expert was "more definitive," "not wimpy," and "very staunch in his opinion." Her attorney explained that he had made a "plurality of attempts" to contact plaintiff's preferred expert, but having received no response, retained another whom he considered "just as competent" and capable of providing "everything" he needed for expert testimony.
>
> . . .
>
> As the trial court correctly stated, "[t]he decision regarding which expert, or how many experts, to retain is a classic strategy decision within the discretion of the attorney." . . . A disagreement on strategy does not rise to the level of "good cause" sufficient to support a motion to withdraw. . . . The trial court thoroughly examined these strategy disagreements, and its determination that counsel made reasonable decisions within the purview of his professional discretion is firmly rooted in the record. The primary

28

conflict was over the way in which the case would be tried, and plaintiff points to little more than her disagreement with these decisions to support her motion. . . . The choices at issue were well within the discretion of plaintiff's counsel, and the trial court did not abuse its discretion in denying the motion.

*Puppolo*, 2011 VT 119, ¶¶ 9, 17 (internal citations omitted). Rather than squarely address the Vermont Supreme Court's *Puppolo* decision, the August 15, 2016 Opinion does not even mention it.

It is well-established that violations of professional responsibility do not *per se* constitute legal malpractice. *See, e.g.*, *Davis v. Findley*, 422 S.E.2d 859, 860 (Ga. 1992) (collecting cases and holding that an alleged violation of the Code of Professional Responsibility, "*standing alone*, cannot serve as a legal basis" for a legal malpractice action) (internal quotation marks omitted) (emphasis in original). Moreover, even if Defendant had been truthful with Plaintiff and the trial court, the August 15, 2016 Opinion fails to adequately explain why this would have produced a favorable outcome for the Estate. In other words, had Defendant been honest in explaining to both Plaintiff and the trial court why he chose not to call certain witnesses, use certain textbooks and treatises, or ask certain questions, it is not clear how this would have produced a different result. The jurors in the Dodig malpractice action were not privy to the reasons for his strategic decisions, nor should they have been.

Finally, the August 15, 2016 Opinion is inadmissible because it purports to instruct the jury as to the relevant law and the conclusions it must reach regarding the credibility of witnesses and the persuasiveness of their testimony. "'The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.'" *Andrews*, 882 F.2d at 709 (quoting *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)). As the Second Circuit has explained:

Generally, the use of expert testimony is not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." When

29

an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

*United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (citations omitted); *see also Nimely*, 414 F.3d at 398 ("Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.").

While vigorous cross-examination, introduction of opposing views, and cautionary instructions from the judge may address some of the risks posed by the August 15, 2016 Opinion, the Second Circuit has recognized that even if a court reminds a jury that a lawyer's views of the law are "'not binding[,]'" "such a charge cannot always cure the trial court's error in allowing inadmissible evidence." *Fiataruolo v. United States*, 8 F.3d 930, 942 (2d Cir. 1993). In such circumstances, "allowing attorneys to testify to matters of law would be harmful to the jury." *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). "First, the jury would be very susceptible to adopting the expert's conclusion rather [than] making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the attorney's experience and expertise, it might think the witness even more reliable than the judge.'" *Id.* "Second, if an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury." *Id.* As the *Daubert* Court observed: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks omitted).

In this case, when the inadmissible parts of the August 15, 2016 Opinion are excluded, there is little left. In tacit recognition of this fact, Plaintiff's counsel asked Attorney O'Toole in an email whether they should "bit[e] the bullet" because they could not show legal malpractice. (Doc. 74, Ex. L.) When coupled with evidence that Attorney O'Toole performed no independent legal research in rendering the August 15, 2016 Opinion, to nonetheless allow him to testify as an expert witness before a jury would be a derogation of the court's gatekeeping function.

Because the August 15, 2016 Opinion is untimely and inadmissible under Fed. R. Evid. 702, *Daubert* and its progeny, and Fed. R. Evid. 403, Defendant's motion to exclude Attorney O'Toole opinions is GRANTED.

## D. Whether Defendant Is Entitled to Summary Judgment as to Plaintiff's Legal Malpractice Claim (Count I).

Defendant contends that, in the absence of admissible expert testimony, Plaintiff's legal malpractice claim cannot survive summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In federal court, where jurisdiction is premised upon diversity of citizenship, the court applies the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Vermont applies "the Restatement (Second) of Conflicts for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (Vt. 2000). This approach chooses the substantive law of the state that "has the most significant relationship to the occurrence and the parties." *Amiot v. Ames*, 693 A.2d 675, 677 (Vt. 1997). Because Plaintiff's claims arise out of Defendant's representation of Plaintiff in Vermont, it is the state with the most significant relationship to the occurrence and the parties and thus Vermont law governs Plaintiff's legal malpractice claim.

Under Vermont law:

[a] lawsuit against an attorney for negligence generally requires: (1) the existence of an attorney-client relationship which establishes a duty of care;

31

> (2) the negligence of the attorney measured by his or her failure to perform in accordance with established standards of skill and care; and (3) that the negligence was the proximate cause of harm to plaintiff.

*Hedges v. Durrance*, 2003 VT 63, ¶ 6, 175 Vt. 588, 589, 834 A.2d 1, 3. "If the alleged negligent conduct is a matter of judgment unique to that profession, the above elements must be established by expert testimony to assist the trier of fact in determining negligence." *Estate of Fleming v. Nicholson*, 724 A.2d 1026, 1028 (Vt. 1998). "The only exception to this requirement is where the 'lack of care is so apparent that only common knowledge and experience are needed to comprehend it.'" *Clayton v. Unsworth*, 2010 VT 84, ¶ 17, 188 Vt. 432, 439, 8 A.3d 1066, 1072 (quoting *Estate of Fleming*, 724 A.2d at 1028). An attorney's strategic decisions, including whether to call particular witnesses and introduce certain documentary evidence, are "matter[s] of judgment unique to" the legal profession. *Estate of Fleming*, 724 A.2d at 1028. As the Supreme Court of Texas has explained: "[d]ecisions of which witnesses to call, what testimony to obtain or when to cross-examine almost invariably are matters of judgment. As such, the wisdom and consequences of these kinds of tactical choices made during litigation are generally matters beyond the ken of most jurors." *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119 (Tex. 2004) (citation and internal quotation marks omitted).

In light of the Vermont Supreme Court's conclusion that Defendant's selection of the witnesses and evidence to present at trial in the Dodig malpractice action constituted "reasonable decisions within the purview of his professional discretion[,]" *Puppolo*, 2011 VT 119, ¶ 17, Plaintiff carries a heavy burden to establish that they nonetheless constitute a deviation from the applicable standard of care which caused her damages. It is not enough for Plaintiff to claim that Defendant promised to pursue certain strategies in the Dodig malpractice action and failed to do so because Plaintiff cites no Vermont authority for the proposition that a legal malpractice claim can be brought on that basis.

Correspondingly, Plaintiff proffers no facts that Eva Puppolo's death was so clearly caused by medical malpractice that even a lay person could conclude that

Attorney Dodig failed to timely file a meritorious lawsuit. *See Corey v. Norman, Hanson & DeTroy*, 742 A.2d 933, 940 (Me. 1999) (stating that in the absence of expert testimony, "the factfinder would be compelled to speculate as to proximate causation"). In turn, "from the perspective of a lay juror, the causal link between the [P]laintiff's allegations of negligence" by Defendant and the adverse outcome in the Dodig malpractice action "is far from obvious." *Bozelko v. Papastavros*, 147 A.3d 1023, 1030 (Conn. 2016). Expert witness testimony is thus essential to Plaintiff's legal malpractice claim against Defendant. *See Estate of Fleming*, 724 A.2d at 1025. She has not, and cannot, establish a breach of the duty of care and causation without it.

Because Plaintiff has failed to establish the essential elements of legal malpractice under Vermont law, Defendant's motion for partial summary judgment as to that claim is GRANTED and Plaintiff's legal malpractice claim (Count I) is hereby DISMISSED. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating that the entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to admit audio recordings is hereby DENIED. (Doc. 76.) Defendant's motion to dismiss the action is DENIED. The court EXCLUDES the opinions of Attorney O'Toole in their entirety and GRANTS IN PART AND DENIES IN PART Defendant's motion for expenses. Plaintiff is ORDERED to pay Defendant the sum of $500.00, together with any photocopying costs incurred by Defendant in producing his file. The court GRANTS Defendant's motion for partial summary judgment as to Plaintiff's legal malpractice claim (Count I) and that count is DISMISSED. (Doc. 42.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 12ᵗʰ day of September, 2017.

Christina Reiss, Chief Judge
United States District Court