U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 JUN 19 PM 4: 23

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ESTATE OF EVA C. PUPPOLO,           )
CELESTE PUPPOLO, Executor,          )
                                    )
            Plaintiff,              )
                                    )
    v.                              )          Case No. 5:14-cv-00095
                                    )
JOHN J. WELCH, JR.,                 )
JOHN J. WELCH, JR., LTD.,           )
                                    )
            Defendants.             )

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 88)

Plaintiff Estate of Eva C. Puppolo (the "Estate"), Celeste Puppolo, Executor brings

this action against Defendants John J. Welch, Jr. and John J. Welch, Jr., Ltd.

(collectively, "Defendants"), alleging four state-law causes of action: legal malpractice

(Count I), negligent misrepresentation (Count II), and two counts of breach of contract

(Counts III and IV). On September 12, 2017, the court granted partial summary

judgment in Defendants' favor and dismissed Count I.

Pending before the court is Defendants' motion for summary judgment on the

remaining counts. With respect to Counts II and III, Defendants argue that Plaintiff

alleges claims duplicative of her dismissed legal malpractice claim and which are not

cognizable as separate claims under Vermont law. With regard to Count IV, Defendants

contend that Plaintiff consented to the actions which she now claims constitute a breach

of contract.

Plaintiff agrees that summary judgment with respect to Count II may be granted.

Summary judgment with respect to Count II is therefore GRANTED and that claim is

hereby DISMISSED. She opposes summary judgment, however, with respect to Count

III, arguing that the promises made to her by Defendant Welch during his representation

are distinct from her legal malpractice claim. In Count IV, she alleges that Defendant Welch disbursed funds belonging to the Estate without her authorization or consent and contends that this claim "[s]tands on its [o]wn[.]" (Doc. 103 at 7.) The court took the pending motion under advisement on April 9, 2018.

Plaintiff is represented by R. Peter Decato, Esq. Defendants are represented by David L. Cleary, Esq.

## I.    The Undisputed Facts.

Plaintiff is the niece of Eva Puppolo, who passed away in 2003 while residing at Crescent Manor Care Centers ("Crescent Manor"), a nursing facility and healthcare provider located in Bennington, Vermont. Plaintiff alleges that the administration of a lethal amount of fentanyl caused her aunt's death and maintains that this and other treatment were "at [a] minimum, grossly negligent and reckless, and consequently brought about what prudent health practitioners would have known to be certain death." (Doc. 1 at 8, ¶ 55.) Plaintiff retained Christopher S. Dodig, Esq. to prosecute survival and wrongful death claims against Crescent Manor. Attorney Dodig allegedly failed to commence a timely action.

Plaintiff thereafter retained Defendants to bring a legal malpractice action against Attorney Dodig and his law firm in the Vermont Superior Court (the "Dodig malpractice action"). The Dodig malpractice action resulted in a defense verdict in January 2010. The Vermont Supreme Court upheld the verdict the following year. *See Puppolo v. Donovan & O'Connor, LLC*, 2011 VT 119, 191 Vt. 535, 35 A.3d 166.

On May 7, 2014, Plaintiff filed the instant action, alleging that Defendant Welch's legal representation breached the applicable standard of care and that he breached several promises to her regarding how the Dodig malpractice action would be prosecuted. In her Complaint, Plaintiff identifies a number of these alleged acts and omissions. For example, in Count I, she alleges that "[f]ailing to call [Brianna] DiMaggio as a witness" "violated . . . acceptable standards of care[,]" and in Count III she alleges that "Mr. Welch promised and agreed to call Ms. DiMaggio as a witness[.]" (Doc. 1 at 14-15, 17, ¶¶ 93, 116.)

2

Count I alleges that "[f]ailing to call Dr. Totonelly as a witness" "violated . . . acceptable standards of care[,]" while Count III alleges that "Mr. Welch promised . . . that he would call Dr. Totonelly as an expert witness, first in the case in chief, and then in rebuttal." *Id.* at ¶¶ 93, 115.

Counts I and III both allege other acts and omissions by Defendants including: the failure to use a police report at trial; the failure to use hair sample forensics; the failure to introduce evidence that Eva Puppolo's healthcare providers falsified records; the failure to use audio tapes to impeach defense witnesses; and the failure to introduce Eva Puppolo's will at trial.

Count IV alleges that, during the Dodig malpractice action, Defendant Welch improperly disbursed $7,223.10 from his client trust account to Attorney Dodig from $31,000 in funds which were intended to compensate an expert witnesses.[1] On January 22, 2010, before the jury was instructed, Plaintiff and Attorney Dodig stipulated on the record to payment of the $7,223.10 in resolution of Attorney Dodig's counterclaim. Defendant Welch informed the court that he intended to provide Attorney Dodig with a check in satisfaction of the agreed upon amount the following business day and requested that it be "stipulated fact that they had been paid, so that the jury's not in there wondering[.]" (Doc. 88-6 at 9.) The court declined to rule on Defendant Welch's request at that time.

On the following business day, Monday, January 25, 2010, Attorney Dodig's counsel represented to the court that he "did get a check from Mr. Welch today but, you know, it hasn't cleared." (Doc. 88-7 at 3.) Counsel requested that Defendant Welch be precluded from arguing the Estate's payment of the stipulated amount to the jury. The trial court agreed, noting that "[t]here is no evidence in this case that anything's been

---

[1] Prior to trial, the Vermont Superior Court (Howard, J.) issued a Writ of Attachment and Trustee Process as well as an Order of Approval which found "a reasonable likelihood the defendants will recover judgment against the Plaintiff, Celeste Puppolo, Executor of the Estate of Eva C. Puppolo, in the amount of $7,223.10, plus interest, over and above any known available liability insurance, bond or other security." (Doc. 88-2 at 2.)

paid." *Id.* The jury was thus not instructed on the counterclaim and made no findings with regards to payments owed by the Estate to Attorney Dodig and his firm.

According to Christopher D. Ekman, Esq., trial counsel for Attorney Dodig, Plaintiff was present in the courtroom for both the January 22 and January 25, 2010 discussions regarding the $7,223.10 payment to resolve Attorney Dodig's counterclaim. Attorney Ekman further avers that "I have no recollection, and I see nothing in the exhibits attached, that suggests that Celeste Puppolo, as Executor of the Estate of Eva Puppolo, ever objected to the payment made by Mr. Welch to us as attorneys for the defendants." (Doc. 88-4 at 2.)

## II. The Disputed Facts.

### A. Plaintiff's Statement of Disputed Facts.

Plaintiff submitted a Statement of Disputed Material Facts as follows:

#### I. Count [III]

1. Whether the parties entered into a binding contract.

2. Whether, when defendants entered into the contract, it was the honest exercise on their part of professional judgment.

3. Whether the defendants breached that contract.

4. Whether the plaintiff sustained damage as a result of the breach.

#### II. Count [IV]

1. Whether the release of trust funds was made with the consent of the Estate.

(Doc. 103-2 at 1.)

### B. The Totonelly Affidavit.

In addition to her Statement of Disputed Material Facts, Plaintiff submitted the affidavit of Philip R. Totonelly, M.D., although she neither cites to it nor appears to directly rely on it to support her remaining claims. Because the Totonelly affidavit is the only new evidence submitted by Plaintiff in opposing summary judgment, the court reproduces it in its entirety:

1. I am a licensed physician and surgeon with a practice in cardiovascular disease and internal medicine. I am board certified in

cardiology and internal medicine and currently practice in the State of New York.

2.    On[] April 21, 2005, I was retained as a medical expert witness in the case of the Estate of Eva C. Puppolo that was to be brought as a wrongful death action against Crescent Manor Care Centers in Bennington, VT and the medical practitioners caring for Eva C. Puppolo. I rendered an opinion on Eva Puppolo's death. A copy of my opinion is attached to my affidavit and is incorporated herein by reference.[2]

3.    Prior to rendering my opinion, I examined two toxicology reports. One was dated July 20, 2003 and the other, dated February 10, 2005. I noted that in the February 10, 2005 assay no norfentanyl was found. This indicated to me that the dosage of fentanyl was acutely administered (given just prior to Eva's death) on February 25, 2003. I opined that the cause of death was fentanyl poisoning. I became committed to offering my services in rendering a formal opinion stating that fentanyl intoxication was the proximate cause of death.

4.    In my written opinion, I addressed a prior issue where Eva was wrongly administered medication at Crescent Manor. The wrong medication was Glyburide and it was my opinion that this event (misadministration of Glyburide) led to a downfall in Eva's health during August, 2003; however, the cause of death, evidenced by Eva's lethal fentanyl levels, was fentanyl poisoning by the administration of a massive dose of fentanyl, ordered by John Hearst, M.D. via fax and administered by Crescent Manor nursing staff.

5.    I informed Celeste, executor of Eva Puppolo's estate of my findings. I had received a note mailed to me by Celeste, that was penned by Mr. Dodig, attorney for Eva's estate, addressed by Mr. Dodig specifically to me. It read:

> "Crescent Manor criminal question for Dr. T. → do the liver tissue lab values demonstrate that the most likely cause of Eva's death was through overdose by opiates?"

6.    At first I responded by phone to Mr. Dodig with my opinion, which was, without question, that Eva died by acute fentanyl poisoning. As stated in paragraph 3 above, I knew this to be an absolute when I reviewed the Vermont Medical Examiner's toxicology result and the latter NMS toxicology report, assays that revealed lethal values of fentanyl in Eva's liver. The range for fentanyl fatalities in nanograms per gram, liver tissue,

---

[2] While no formal opinion is attached to Dr. Totonelly's affidavit, he does attach an email to Celeste Puppolo wherein he expresses his opinion that Eva Puppolo died from "fentanyl intoxication." (Doc. 103-1 at 5.)

is easily ascertained by referring to the medical examiner's authority, *Disposition of Toxic Drugs and Chemicals In Man.*

7.      I then informed Celeste as follows: "I am extremely bothered by the levels of drug found and firmly believe, that even on a compassionate basis, no such dosage would be administered - not even to a dying patient, unless either by negligent action or intentional administration to bring about certain death."

8.      Mr. Dodig was silent as to my opinion, and instead wanted to know how I knew Celeste. He seemed disinclined to discuss the pertinent toxicological facts as correlated with Eva's clinical findings and the actual fentanyl doses in mcg administered by the nursing home that were responsible for inducing severe hypoventilation and death. In answering Mr. Dodig's question, I told him that I had never met Celeste, but I had spoken with her over the phone. Since I was also learning directly from Mr. Dodig himself that he had relegated to Celeste the duty to contact and secure me as a medical expert witness, I was perplexed and found his practice to be highly unusual. But because all medical records between September 8, 2002 to February 3, 2003 were missing, I had felt that it might be useful to be able to ask questions of Eva's relative.

9.      I remained puzzled by this situation because a short time later Celeste phoned me to say that Mr. Dodig no longer wanted her to communicate with me. I had told him and her that in no manner had she influenced my medical expert opinion.

10.     I began to receive phone calls from Mr. Dodig's associates at Flynn & Dagnoli Funeral Home in Massachusetts, along with representatives from the mayor's office, asking me to contact Celeste personally and attempt to persuade her to bury Eva's body before the Massachusetts medical examiner, Benjamin Glick, M.D., would be conducting a second autopsy. I remember emailing Celeste that she ought to think about retaining a different attorney because something was not right. I found these events to be deeply disturbing. Celeste phoned me on the heels of my cautionary email to her and stated to me that Mr. Dodig nevertheless still wanted an opinion from me. I recall having the impression that Celeste held him to his original penned note to me.

11.     I believe it was the evening before August 12, 2005 that I put my medical opinion in writing. I called Celeste and read it to her. I told her I would send it to her by email and she would have it by morning. She did not seem entirely comfortable with that since Mr. Dodig had informed her that he hadn't wanted communication between her and me, but at the same time he continued to pursue indirectly a written opinion from me. I had asked Mr. Dodig to send to me the amassed two volumes of Eva's medical

records, but he did not do so. In a conversation with Celeste, she agreed to overnight Eva's medical file.

12.     I sent Celeste the email containing my opinion from my drafts folder and then quickly annotated it to remove any reading that Celeste could have influenced my conclusions. I recall having phoned Celeste the next day to tell her that I had annotated my phraseology, resent the email and to disregard the first message from me. I had thought better about it right after I had hit "Send" since I figured that she would be forwarding my written opinion to Mr. Dodig. I had changed nothing with respect to the medical substance of my opinion.

13.     I recall also adding in my email of August 12, 2005, a legal reference about which I became at loggerheads with Mr. Dodig. I included it because I wanted to document what I had believed to be a concern of Mr. Dodig, based on an explanation he had given me that I did not find sincere. Mr. Dodig seemed disinclined to want to accept my findings on the proximate cause of death and would not dispel with a notion he continued to [perpetuate] that Glyburide had caused Eva's death. However, Mr. Dodig's geriatrician expert, Allan Ross, M.D., had proffered his expert opinion on Mr. Dodig's wrong medication case, and opined that, following administration of Glyburide to Eva, Eva had returned to her baseline (even though the medication error for two full months had compromised Eva's clinical course). Mr. Dodig seemed to want to create a divide between the torts; one, he would view only as a civil matter; the other, only criminal. He was using the latter as reason for not pursuing a wrongful death claim against Crescent Manor in spite of the categorically positive fentanyl toxicology results. At the same time, Mr. Dodig was pushing me to conclude that Crescent Manor's [G]lyburide error was contributory. I disagreed, and at one point warned Celeste that Mr. Dodig may be creating a *res judicata* issue. I remember explaining to Celeste what that was, shortly thereafter.

14.     Roughly two weeks later, I conducted a conversation with Mr. Dodig and Celeste by telephone. I took the opportunity again to deliver to him my findings on Eva's death by fentanyl poisoning. I explained to him why I had concluded in my August 12, 2005 opinion, that the fentanyl dosage administered to Eva was not only massive, it was unheard of clinically. He remarked that he was "reeling" with the new information I had provided him. I will never forget this response of Mr. Dodig. He then assured me that he would take my expert opinion under consideration and decide how he would next proceed, but I never heard from him again. I learned later from Celeste's attorney, Mr. Welch, that Mr. Dodig had withdrawn from his representation of the estate's matter.

15. Mr. Welch informed me that Mr. Dodig would no longer be pursuing the wrong medication matter because Dr. Ross concluded that Eva's medical record did not support that Eva failed to recover from the hypoglycemic incident. Mr. Welch apprised me that he, as a consequence, was bringing a legal malpractice claim against Mr. Dodig for his negligence in pursuing Eva's fentanyl fatality. We discussed how the Defendants in this case tried to attribute Eva's death to "heart failure," but I assured Mr. Welch that there was *not one EKG performed in weeks previous to substantiate such a claim*; in fact, there was evidence to the contrary, as noted by Eva's cardiologist at Southwestern Vermont Medical Center.

16. Mr. Welch stated to me that he was designating me as the case's expert witness. He stressed that my testimony would be critical since I was a cardiologist and could opine as to the mechanism of Eva's death by fentanyl. He represented to me that he needed my expertise because applying transdermal fentanyl (Duragesic) patches was part of my clinical practice in the ICU setting. He informed me that he was designating me as his premier witness on a 26(b)(4) statement that he was preparing. He mentioned that Dr. Glick had completed a second autopsy and would also be contributing expert testimony to confirm the Vermont medical examiner's forensic toxicology results. Both medical examiners had employed the same nationally based forensic toxicology lab that yielded fatal values.

17. That I am a practicing cardiologist, I was prepared to explain in court the concept of "acute subendocardial infarction," and I was to inform that central nervous system depression from the opiate, fentanyl in massive overdose led to Eva Puppolo's cardiac arrest The fentanyl overdose caused hypoventilation which led to oxygen desaturation, hypoxia, and to respiratory failure, with the end result leading to cardiac ischemia and cardiac arrest, with a tissue manifestation of acute subendocardial infarction.

18. What I recall also is that Mr. Welch apparently asked Celeste to set up a phone conference for him and me. She called my New York practice as I had understood from my office manager, and he gave to her my contact information. I had taken a medical stint in Kansas for a brief period of time and agreed to speak with Mr. Welch who conveyed he would phone me at a precise time after office hours. I made sure to be available, but I never received his call.

19. I called Mr. Welch during the Spring and Fall of 2009 to inquire about the scheduling of trial. He stated he did not yet have a date, but that my testimony was critical to the case and that he would call me. I did not hear from Mr. Welch after the month of November. We had left it that he

would contact me by phone and email. I phoned him during the month of December to check on the status of the trial, but he did not return my call. Mr. Welch had my office and cell phone numbers. In mid-January, 2010, Celeste phoned me to say she was in trial with the case and to expect a call from Mr. Welch who wanted me to be available as a rebuttal witness. I could not understand why he never called me for my direct testimony, and I told Celeste this. I received no form of correspondence from Mr. Welch, email, regular mail, or messages by phone. During our last conversation[,] Mr. Welch made it clear to me that he had reserved, in his escrow trust fund, money for my trial appearance. It had always been my intention to be present to testify at trial in this case.

(Doc. 103-1 at 1-4.)

In her brief, Plaintiff further asserts that her "opposition is based on the memorandum in opposition, separate statements of facts in dispute, and other affidavits already of record in this matter." (Doc. 103 at 1.) A generalized reference to the record is insufficiently specific and gives the court no guidance as to the factual matters allegedly in dispute. Moreover, a court is not obliged to "hunt through voluminous records without guidance from the parties[,]" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), nor is a court "'required to consider what the parties fail to point out.'" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)). Nonetheless, because the pending motion is case dispositive, the court considers the August 15, 2016 affidavit Plaintiff filed with her Response in Opposition to Defendants' Motion to Dismiss, or in the Alternative, Motion for Judgment, or in the Alternative, Motion to Preclude Further Opinions. This thirty-eight page affidavit appears to be the most comprehensive articulation of the facts Plaintiff contends support her claims.

In her affidavit, Plaintiff avers Defendants made the following promises to her in the course of Defendant Welch's representation of the Estate in the Dodig malpractice action:

Calling Ms. DiMaggio as a Witness

39.    Mr. Welch promised, right up until and during the trial in the case he
       was formulating, to call Ms. DiMaggio as a witness, but he failed to
       do so; in fact, I found out that he had never subpoenaed her.  Mr.
       Welch also promised to use the Bennington Police report at trial to
       show the reckless disregard and ill will of Crescent Manor medical
       staff, but he failed to do so.  I had been relying on him to do this, but
       he reneged after mediation on November 16, 2009.  Though, later,
       Mr. Welch again changed his mind when he revoked a motion in
       limine that he had filed.

                                    * * *

60.    Mr. Welch nonetheless had communicated to me during the trial that
       he would still call Brianne DiMaggio, L.N.A. to testify 'on rebuttal'
       that Crescent Manor Care Centers had hired a company individual
       for the express purpose of altering my aunt's medical records.  As
       aforestated, Ms. DiMaggio had previously reported her findings to
       Mr. Dodig, all the evidence and information of which, by virtue of
       an audio recording that she made of her testimony, she, through me,
       relegated knowingly to Mr. Welch.  Mr. Welch promised at that time
       to use the evidence of the 'doctored' documents at trial as proof of
       fraud in the Crescent Manor Care Centers medical record and
       advised me to acquire a report from the McCann firm, responsible to
       analyze the way my aunt's Nurses' Care Plan in the medical record
       had been changed.

(Doc. 43-2 at 8-9, 22.)

Forensic Hair Samples

40.    The Vermont Medical Examiner had requested of me that hair
       samples of my aunt be taken in order to establish forensically and
       confirm all indication in the medical record that she had no tolerance
       to opioid drugs.  I complied, since the M.E. instructed that this
       would be good adjunct information to have should the Estate bring
       legal action against Crescent Manor and its doctors.  Mr. Welch
       promised to utilize the Estate's hair sample toxicology and then
       reneged at a time, unfortunately, that this assay became, not merely
       confirmatory, but indispensable for prevailing at trial.

Id. at 9.

Medical Literature to Discredit Dr. Glick's Changed Opinion

In the Dodig malpractice action, Plaintiff planned to call Dr. Glick, a Massachusetts Medical Examiner, to opine that the cause of her aunt's death was a fentanyl overdose. Shortly before trial, Dr. Glick opined that fentanyl was only a contributing factor in Eva Puppolo's death. Plaintiff avers that Defendant Welch breached his promise to cross-examine Dr. Glick with a treatise he had previously relied on in forming his initial opinion.

> 42. On the stand, Dr. Glick, who, as medical examiner, has always been a part of the case, testified that fentanyl was 80 to 200 times the potency of morphine and that my aunt bore the weight of a child on February 25, 2003. Therefore, he opined that the correct measure to be used to determine fatality levels was his Medical Examiner's forensic authority, *Disposition of Toxic Drugs [a]nd Chemicals in Man* (DTDCM), that normatively documents the range of lethal fentanyl levels in liver tissue being 5.9 to 78 ng/g. My aunt's forensic toxicology results fell in the fatality range for fentanyl at 25.0 ng/g, according to the Vermont Medical Examiner's toxicology result, and 36.0 ng/g, according to corroborative forensic toxicology results by the National Medical Services Laboratories, the nation's "specialist lab in postmortem toxicology problems," as named by the Vermont Medical Examiner.

*Id.*

Plaintiff further avers that despite his "affirmations and assurances[,]" Defendant Welch "refused to present for Dr. Glick's testimony at trial Dr. Glick's 'red' Medical Examiner's forensic authority, *Disposition [o]f Toxic Drugs [a]nd Chemicals In Man*, from which to have our expert cite the established lethal forensic data for fentanyl." *Id.* at 11, ¶ 44. She claims that this book was essential to the presentation of her case because of Dr. Glick's changed opinion regarding the role of the fentanyl in her aunt's death, stating to Defendant Welch that "it stopped her breathing on that day. How come he's not willing to say, now, that 75 mics was a little bit too much for a 68-pound individual?" *Id.* at 15, ¶ 50. Plaintiff states that "Mr. Welch had promised me that he would share my scientific information [the complete study for two of three forensic

toxicology abstracts] with Dr. Glick, then to be advanced at trial, but he did not." *Id.* at 22, ¶ 58.

Dr. Totonelly as Witness.

Plaintiff contends that Defendant Welch both promised and then later refused to call Dr. Totonelly as a substitute witness for Dr. Glick, despite his being initially named as a witness in a Fed. R. Civ. P. 26(b)(4) statement. She avers that she tape-recorded a conversation with Defendant Welch wherein the parties engaged in the following exchange:

**Ms. Puppolo:** Jack, why cannot he be used if he's named in the 26(b)(4)?

**Mr. Welch:** Because I indicated to the defense a long time ago that we were going to use Dr. Glick.

**Ms. Puppolo:** It doesn't matter. If he's named, he's usable.

**Mr. Welch:** Celeste, look,

**Ms. Puppolo:** Jack, if you really wanted Totonelly, you could use him.

**Mr. Welch:** Celeste, what we need to do is – you need to get a motion to continue, 'cause that's what you want.

**Ms. Puppolo:** Jack, why don't you want to use Dr. Totonelly, 'cause he's too powerful, and the case is going to be a big win? If he's on a 26(b)(4), according to the rules –

**Mr. Welch:** Listen. You need to send me an email telling me, one, move for a continuance, and I understand you will be withdrawing from the case. Just do that. Here's the choice we have here. Either I try the case the way I think it should be tried, or you'll need to get another attorney, and we need to tell the court, "Look, Your Honor, we've got a big problem here, and Mister, you know, Mr. Welch and Ms. Puppolo have a vast difference of –"

**Ms. Puppolo:** Well, it's, it's a lot worse than that, to me. It's, you know, it's, it's what's happening around us, that I don't think there's time enough to accommodate.

**Mr. Welch:** Celeste, I – Celeste, I –There's no way I'm gonna, there's no way I'm gonna get involved with hair samples, okay? I'm not going to do that.

**Ms. Puppolo:** Why not?

**Mr. Welch:** I'm not gonna, I'm not gonna do it.

**Ms. Puppolo:** Yeah, yeah, but that's why I don't feel like you're acting in my best interest.

**Mr. Welch:** I, I, I got that, Celeste. You don't think I'm acting in your best interest, and that's —You're entitled to your opinion. Well, look. So, I'm not going to do it. Okay? So, the thing is, is that, you know, what I need to do, Celeste, is I need to get an email from you, okay? – Giving me a directive. Okay. And then I'll act on the directive. I'll act very promptly on the directive.

**Ms. Puppolo:** We're smack up against the trial itself. And, our medical expert witness is doing strange things, which seems to be playing right into the defense's ability to eliminate the only expert witness – which of course would then be fatal to the case. There's something very wrong with this picture, Jack.

**Mr. Welch:** Okay. Well, Celeste, what I need from you is a very clear directive on the email . . .

**Ms. Puppolo:** And they're using the grounds that he simply changed his testimony as reason why he should not be allowed to testify?

**Mr. Welch:** Essentially it, in a nutshell. Yeah. Okay, and, as far as I'm concerned, it's bogus, okay? And as soon as you and I get through talkin'–

**Ms. Puppolo:** Well, but, but they would never have known about it, had you not gone running to them with the fact that he changed his testimony.

**Mr. Welch:** Right. You're right. They would, never would have known about it if I hadn't a' been, uh, a lawyer who happens to, uh, be a lawyer who takes pride in his professionalism, and his integrity, and takes pride in being professionally responsible, and takes pride in making sure that I disclose very promptly to the other side when there's been a change.

**Ms. Puppolo:** Why?

**Mr. Welch:** That's the way I practice law.

**Ms. Puppolo:** Why? That –

**Mr. Welch:** Some lawyers do it differently.

**Ms. Puppolo:** No lawyer would, no lawyer for the plaintiff would ever do that. Mary, do you follow that?

**Ms. Sheridan:** No question. And I'm not a lawyer. But it seems to me like the –

**Mr. Welch:** I beg to disagree. Okay?

*Id.* at 17-18, ¶ 50.

Refusal to Discredit Vermont Medical Examiner

65. After having conducted direct discussions with me about his being able "to place [his] entire fist into the lumbosacral wound" of my aunt and expressing his belief that Crescent Manor had "administered a massive overdose of Duragesic" into my aunt, Vermont State Medical Examiner Paul Morrow mismeasured the tear in my aunt's lumbosacral region as "1 centimeter," entered this mismeasurement into his autopsy report, and claimed in his final autopsy report that my aunt died of "natural causes." Mr. Welch, in the underlying medical malpractice case, was in custody of Dr. Morrow's initial excited utterances on an audio answering machine tape as Dr. Morrow was both 1) descriptive of my aunt's gaping lumbosacral wound and 2) exclamatory, with 'Wow,' as he was concomitantly viewing the very chart that showed the violated administration schedule and massive overdosing of fentanyl.

66. Mr. Welch refused to expose Dr. Morrow's mismeasurement and would not show the jury the scientific ruler I brought with me for him to use in trial. I entreated Mr. Welch to discredit Dr. Morrow in my teleconference with him and Ms. Sheridan on December 31, 2009[.]

\* \* \*

69. Mr. Welch agreed on December 31, 2009 to impeach Dr. Morrow[.]

\* \* \*

71. Mr. Welch later reneged on impeaching Dr. Morrow with Mr. Dodig's own testimony given that Mr. Dodig had spoken the following into my answering machine: "I'm on your side . . . You deserve credit for not having trusted the autopsy. You've done a heck of a job as an investigator. Your intuition has proved to be effective thus far, so we'll wait for the evidence to come in."

\* \* \*

72. Mr. Welch promised me that he would use the above-referenced recordings at trial to impeach Defendant Mr. Dodig and his law firm,

and the Defendants' witnesses. Mr. Welch, though I was relying on
him to do so, did not do so.

*Id.* at 24-26.

Failure to Depose and Properly Cross-Examine Defense Experts

Plaintiff avers that Defendant Welch promised to depose defense expert witnesses
in the Dodig malpractice action, failed to do so, and "reneged on his promise to [her] that
he would expose the fact that [defense expert witness] Dr. Von Wilking was an active
member of the National Association of State Jury Verdict Publishers." *Id.* at 34, ¶ 85.
She avers Mr. Welch promised to cross-examine Dr. Von Wilking with the Physician's
Desk Reference's warning regarding fentanyl dosages exceeding 45 mcg and failed to do
so.

Summary of Breached Promises

At the conclusion of her affidavit, Plaintiff summarized Defendant Welch's
breached promises as follows:

> 80.    Mr. Welch had promised to subpoena for trial those key Crescent
> Manor nurse fact witnesses who had direct knowledge of events in
> my aunt's death, but he left the Estate high and dry by not having
> subpoenaed a one. Mr. Welch, during the trial, like he assured me
> with Brianne DiMaggio, L.N.A., promised to call Dr. Totonelly "on
> rebuttal." Two weeks before the trial, he responded to me that he
> would call Dr. Totonelly as a witness, since, at trial, as I had
> predicted, it became so evident that we needed Dr. Totonelly's
> longstanding opinion on causation, which had remained a constant,
> and had never been changed by anyone. However, Mr. Welch did
> not come through as he agreed to[.]
>
>                                     \* \* \*
>
> 100.   Mr. Welch was not honest with me while representing the Estate
> because he said one thing in our preparation and did the polar
> opposite when we got to court. I knew that Mr. Welch was deceitful
> right after mediation, November 16, 2009, as he mishandled the
> Estate's trial evidence and failed to subpoena essential fact
> witnesses. Two weeks before trial, also in the presence of Mary
> Sheridan, Mr. Welch promised to subpoena Brianne DiMaggio,
> L.N.A. for her fact witness testimony, but he did not. I worried that
> he was sabotaging the case and I could not understand why. I

> attempted to bring in other lawyers to monitor/help him, to which
> Mr. Welch agreed, but then he reneged on that also, on the morning
> of pretrial, when it was then too late do anything about it.

*Id.* at 30, ¶ 80; 37, ¶ 100.

With regard to Count IV, Plaintiff asserts a single disputed fact: that she did not consent to payment of the $7,223.10 in satisfaction of Attorney Dodig's counterclaim. *See id.* at 34, ¶ 89 ("Mr. Welch, without my authorization, paid the Defendant who had conceded on the stand to having run the wrongful death and survival statutes, $7,223.10."). She does not dispute that she was present in the courtroom on both January 22 and January 25, 2010, when her attorney agreed to the payment of $7,223.10 on the Estate's behalf.

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce

"sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, not all disputes of fact are material – "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

### B.    Whether Plaintiff's Statement of Disputed Facts is Sufficient.

Federal Rule of Civil Procedure 56(e) and Local Rule 56(c) require a party opposing summary judgment to identify disputed facts relevant to the essential elements of a claim or defense. *See Anderson*, 477 U.S. at 250 ("Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial.") (internal quotation marks and footnote omitted). Local Rule 56(c) requires the statement to be "supported as required by Fed. R. Civ. P. 56(c)[,]" which requires that:

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In this case, Plaintiff's Statement of Disputed Material Facts does not directly respond to Defendants' Statement of Undisputed Facts or establish how the facts on which Defendant relies on are in dispute through citation to record evidence. As a result, the facts set forth in Defendants' Statement of Undisputed Facts are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2) (where the party opposing summary judgment does not dispute material facts asserted by the moving party, the court "may consider the fact[s] undisputed for purposes of the motion").

Plaintiff's Statement of Disputed Facts, even when considered in conjunction with her August 15, 2016 affidavit and Dr. Totonelly's affidavit, do not create an issue of fact that precludes summary judgment because the only issues before the court are questions of law. With regarding to Count III, the question is whether Vermont recognizes a separate cause of action for breach of contract arising out of an attorney's legal representation in the circumstances of this case. With regard to Count IV, the question of law is whether, even if Plaintiff originally failed to authorize payment of a counterclaim, she is nonetheless bound by her ratification of Defendant Welch's judicial admission on her behalf by voicing no objection when a check for $7,223.10 was tendered in open court in her presence.

### C. Whether Plaintiff's Breach of Contract Claim in Count III is Duplicative of Count I or Presents a Cognizable Independent Claim.

Defendants characterize Count III as "the epitome of [a] duplicative claim[]." (Doc. 88 at 3.) In support of this contention, Defendants note that Count I and Count III arise from the same operative facts and that Vermont law does not recognize a separate cause of action for breach of contract arising from legal malpractice.

Plaintiff responds that her claims are not duplicative because Count I sounds in tort and Count III in contract. In Count I, she alleges that Defendant Welch failed to provide reasonably competent and professional representation during the Dodig

18

malpractice action and thus breached his duty of care. In contrast, in Count III she alleges that Defendant Welch made a series of promises with regard to the way in which the Dodig malpractice action would be litigated and then breached those promises causing her to suffer damages. She contends that for her breach of contract claim, no expert testimony is necessary. With respect to damages, she contends that the "economic loss rule" prohibits the recovery of purely economic damages for her tort claim in Count I, but no such limitation exists with regard to her breach of contract claim in Count III.

Although Plaintiff points to differences between her dismissed legal malpractice claim and her breach of contract claim, the two claims dovetail in ways that render them indivisible. First, the promises she asserts Defendants breached are the same acts and omissions that underpin her legal malpractice claim. For example, in both claims she alleges Defendant Welch's failure to call certain witnesses, introduce certain evidence, and engage in certain trial tactics caused her damages. A legal malpractice action may include a claim by a plaintiff that she "did not get what she bargained/contracted for, that is, effective legal representation." *Fitzgerald v. Congleton*, 583 A.2d 595, 599 (Vt. 1990) (internal quotation marks omitted).

Second, Plaintiff's legal malpractice claim and her breach of contract claim are alleged to have resulted in the same harm: Defendants' failure to prevail in the Dodig malpractice action. Although Plaintiff seeks to differentiate the damages resulting from Defendant Welch's alleged breach of promises by asserting that "the Estate spent money getting the evidence Mr. Welch promised to use[,]" (Doc. 103 at 3), she does not identify the amount of money in question or otherwise establish that she incurred this expense.

Third, Plaintiff contends that the legal malpractice claim sought damages for "bodily harm to Eva Puppolo[,]" *id.*, while her breach of contract claim seeks damages for economic loss to the Estate. This is a distinction without a difference. Under Vermont law, the measure of damages for legal malpractice claims is all harm "proximately caused by an attorney's negligence[.]" *Sachs v. Downs Rachlin Martin PLLC*, 2017 VT 100, ¶ 29 n.4, 179 A.3d 182, 190. "'[P]urely economic losses may be recoverable in professional services cases because the parties have a special relationship,

which creates a duty of care independent of contract obligations.'" *Id.* (quoting *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 31, 181 Vt. 513, 928 A.2d 497). Thus, consequential damages ordinarily only available in contract are recoverable in a professional negligence suit. *See Vincent v. DeVries*, 2013 VT 34, ¶ 26, 193 Vt. 574, 590, 72 A.3d, 886, 897-98 ("Such damage may include, for example, the expense of rectifying the malpractice, even when that rectification is ultimately achieved through a settlement."). As a result, had Plaintiff prevailed in her legal malpractice claim against Defendants, she would have been able to recover the value of the Estate's claim for Eva Puppolo's bodily harm.

Finally, both Plaintiff's legal malpractice claim and her contract claim are grounded in strategic decisions made by an attorney based upon his professional judgment. Plaintiff's own affidavit makes this point clear. Each promise he allegedly breached as set forth in Count III was a tactical trial decision which "is a matter of judgment unique to [the legal] profession[.]" *Estate of Fleming v. Nicholson*, 724 A.2d 1026, 1028 (Vt. 1998). The Vermont Supreme Court has rejected these types of decisions as the basis for a legal malpractice claim. *See Puppolo*, 2011 VT 119, ¶ 17 ("the decision regarding which expert, or how many experts, to retain is a classic strategy decision within the discretion of the attorney.") (internal quotation marks and alterations omitted).

In light of the overlap between Count I and Count III, the court turns to whether Vermont law nonetheless recognizes an attorney's legal malpractice and breach of contract as separate claims. Under Vermont law, "an action to recover for legal malpractice lies in tort, on the theory of the attorney's negligence." *Bloomer v. Gibson*, 2006 VT 104, ¶ 24, 180 Vt. 397, 406, 912 A.2d 424, 430 (citing *Roberts v. Chimileski*, 2003 VT 10, ¶ 15, 175 Vt. 480, 484, 820 A.2d 995, 999). As a result, where the plaintiff in a legal malpractice action does "not allege that defendant breached any special obligations contained in his employment contract with [the] defendant[,]" an action in contract will not lie. *Id.* Such a cause of action is "'a tort claim veiled as a breach of contract claim.'" *Id.* (quoting *Chavez v. Saums*, 571 P.2d 62, 65 (Kan. 1977)). As the Vermont Supreme Court explained:

> when an act complained of is a breach of specific terms of the contract,
> without any reference to the legal duties imposed by law upon the
> relationship created thereby, the action is in contract, but *where the
> gravamen of the action is a breach of the legal duty and not the contract
> itself, the action is in tort*[.]

*Id.* (internal quotation marks and alterations omitted) (emphasis supplied).

The gravamen of Plaintiff's claim is that Defendant Welch's strategic decisions amounted to negligent representation of the Estate in the Dodig malpractice action in violation of his promises and his duty of care. *Gibson*, 2006 VT 104, ¶ 24. She has proffered no evidence of any special obligations contained in Defendants' representation contract. Regardless of how framed, the claim is one that requires expert witness testimony as to the applicable standard of care and how it has been breached. *Clayton v. Unsworth*, 2010 VT 84, ¶ 17, 188 Vt. 432, 439, 8 A.3d 1066, 1072 ("Because this was a professional negligence case, expert testimony was required to: establish the standard of care; show that defendants' conduct departed from that standard; and show that the conduct was the proximate cause of the . . . harm."). "The only exception to this requirement is where the 'lack of care is so apparent that only common knowledge and experience are needed to comprehend it.'" *Id.* (quoting *Estate of Fleming*, 724 A.2d at 1028). Plaintiff does not demonstrate that exception applies in the instant case.

Correspondingly, Plaintiff's assertion that Defendant Welch did not "engage in the honest exercise of professional judgment[,]" (Doc. 103 at 6) (capitalization omitted), does not create a separate cause of action where one does not otherwise exist. *See Lefebvre v. Cawley*, 2010 WL 286731, at *3 (Vt. Jan. 15, 2010) (Entry Order) (observing that the claim that "is based on defendant's ethical duty as an attorney under the Vermont Rules of Professional Responsibility, as explicitly indicated in plaintiff's complaint, [] thus is, at essence, a legal malpractice claim actionable upon a theory of negligence, not contract."). Far from promising Plaintiff that she would control the strategic decision-making in the Dodig malpractice action, Defendant Welch repeatedly and affirmatively told her she would not. *See* Doc. 43-2 at 17, ¶ 50 ("Either I try the case the way I think it should be tried, or you'll need to get another attorney[.]").

Because Plaintiff's cause of action in Count III is "a tort claim veiled as a breach of contract claim[,]" it must be dismissed on the same grounds as her dismissed legal malpractice claim. *Gibson*, 2006 VT 104, ¶ 24 (internal quotation marks omitted). The court therefore GRANTS Defendants' motion for summary judgment with respect to Count III and that claim is DISMISSED.

### D. Whether Defendants are Entitled to Judgment as a Matter of Law with Respect to Count IV.

With regard to Plaintiff's claim that she did not consent to the disbursement of the $7,223.10 payment to resolve Attorney Dodig's counterclaim, Defendants maintain that there is no evidence Plaintiff objected to the payment when her attorney made this offer in open court. The court agrees. At the summary judgment stage, Plaintiff must proffer admissible evidence in support of the essential elements of her claims or accept their dismissal. *See Celotex*, 477 U.S. at 322 ("the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

It is undisputed that the amount eventually disbursed in settlement of Attorney Dodig's counterclaim was attached through trustee process at the outset of the litigation providing Plaintiff notice of the amount sought and the court's view of the likelihood it would be recovered. It is also undisputed that Plaintiff was present while Defendant Welch and Attorney Ekman described the settlement in open court on two separate occasions. Plaintiff cites no portion of the trial transcript wherein she voiced an objection or withdrew her authority to the judicial admissions made on her behalf.

> Facts admitted by a party "are judicial admissions that bind th[at] party throughout th[e] litigation." *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006); *see also Oscanyan v. Arms Co.*, 103 U.S. 261, 263 [] (1881) ("The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced."); 2 McCormick on Evid. § 254 (6th ed. 2006) ("Judicial admissions are not evidence at all. Rather, they are formal

concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission, unless allowed by the court to be withdrawn, is conclusive in the case[.]").

*Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009).

"[Vermont] law is clear that for ratification of an unauthorized act to occur so as to bind the principal, he or she must have actual knowledge of the material facts being adopted at the time affirmance occurs." *Estate of Sawyer by Howard Bank v. Crowell*, 559 A.2d 687, 691 (Vt. 1989) (emphasis omitted) (citing *Page v. Suraci*, 483 A.2d 601, 603 (Vt. 1984)); *see also Brown v. City of S. Burlington, Vt.*, 393 F.3d 337, 343 (2d Cir. 2004) (stating "[i]t is a generally accepted principle that a voidable contract can be cured by ratification through express or implied conduct, but that a person charged with ratification of such a contract must have acted voluntarily and with full knowledge of the facts.") (internal quotation marks omitted). Defendants bear the burden of proof of establishing Plaintiff ratified Defendant Welch's offer to settle the counterclaim and remove it from the jury's consideration. *See Adams v. Barcomb*, 216 A.2d 648, 650 (Vt. 1966) ("The burden of proof was upon the defendant to prove a subsequent ratification by the plaintiff of the original transaction.").

Here, it is undisputed that Plaintiff was present on two occasions in which Defendant Welch offered $7,223.10 in satisfaction of a claim against the Estate for non-payment of Attorney Dodig's services. She did not voice an objection and she received the benefits of the ratification as the counterclaim against the Estate was not presented to the jury. On those undisputed facts, Defendants have established that Plaintiff ratified the

judicial admissions made on her behalf.[3] Plaintiff fails to proffer any evidence to the contrary, and thus fails to establish her breach of contract claim in Count IV. Because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial[,]" *Celotex*, 477 U.S. at 323, Defendants' motion for summary judgment on Count IV is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Counts II – IV (Doc. 88) is GRANTED. The court directs the clerk of court to enter a Final Judgment as to all counts in Defendants' favor.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of June, 2018.

Christina Reiss, District Judge
United States District Court

---

[3] *See Lakeside Equip. Corp. v. Town of Chester*, 795 A.2d 1174, 1181 (Vt. 2002) (observing that ratification may be established where a party fails to object "within a reasonable time after learning what had transpired or by accepting the benefits of the contract"); *see also Boston & Me. R.R. v. Howard Hardware Co.*, 186 A.2d 184, 187 (Vt. 1962) (finding "substantial evidence" of ratification when "defendant used the leased premises and took advantage of the facilities . . . for nearly three years[.]"); *Manchester Marble Co. v. Rutland R.R. Co.*, 136 A. 394 (Vt. 1927) (noting the fact that the plaintiff occupied the premises and paid rent annually under the lease for three years was evidence of ratification); *see also Ratification*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining ratification as "[a] person's binding adoption of an act already completed but either not done in a way that originally produced a legal obligation or done by a third party having at the time no authority to act as the person's agent").

24